Ray *vs.* The State.

introduction of such matter into the bill, would have these effects. In this, we consider the Court to have been mistaken.

No. 27.—GEORGE W. RAY, plaintiff in error, *vs.* THE STATE OF GEORGIA.

[1.] When the Court is asked to give a charge, in words which are not apt and appropriate, it is proper for it to modify the charge, so as better to convey instruction to the Jury.

[2.] The formation and expression of an opinion by a Juror, from rumor, as to the guilt or innocence of the prisoner, is good cause of challenge for favor. Wherever the objection to a Juror would constitute a sufficient cause of challenge for favor, if discovered before trial, it will present a ground for new trial, if not discovered until after verdict. The Juror will be heard in his own vindication.

[3.] When the Juror is so heard, the Court should, as it were, place itself in the position of triors; and if the explanation of the Juror be such as, in its opinion, should render him competent, if he were before triors, the Court should so pronounce him.

[4.] When, upon a trial for murder, the evidence shows that there was considerable provocation on the part of the decedent—that there was great heat of blood between the parties, and mutual intention to fight, the crime may be reduced to voluntary manslaughter.

[5.] Our law requires, that there should be some assault, by the person killed, upon the person killing; but evidence of such assault, may be found in a mutual intention to fight, and in the fact of an approach, by the decedent, to the prisoner, in furtherance of this design, when it was not necessary for him to do so, in self-defence.

[6.] The fact that a prisoner had accidentally and hastily taken up a board, with which, in a conflict, he inflicted blows that produced death, and had not provided the same, or any other deadly instrument before-hand, is a circumstance which does not favor the conclusion that malice should be implied, because a weapon was used, likely to produce death.

Murder, in Houston Superior Court. Tried before Judge POWERS, October Term, 1853.

George W. Ray was placed upon his trial, under an indictment, for the murder of William F. Taylor. The testimony submitted, was as follows:

*Jesse Cooper* sworn, says: On the 5th day of last February, I saw George Ray run up and caught old man Taylor's lead horse by the bridle; this happened in Houston county, and State of Georgia; the prisoner at the bar is the man; he was cursing of Taylor for breaking his buggy, Taylor said if he broke it he broke it accidentally, and would pay him for it; Ray cursed him *and told him if he did'nt pay him for it then, he would whip him;* Taylor told him if that was what he was up to, he would have a hand with him, or something like that; Taylor then got off his horse and started, as witness 'supposes, to get the hammer out of his wagon, but did not get it; Taylor then went walking off from his wagon towards Thompson's old stand; Ray met him and struck him one lick with the board, which felled the old man; the board in Court, to the best of his knowledge, is the board; he struck the two last licks with the edge of the board in a manner shown by witness to the jury: Ray struck him two licks after Taylor was on the ground, and raised the board to strike again, when witness and others called to stop or he would kill the old man, or had killed him already; Ray replied after he had struck the *last lick, that he 'did'nt care a damn if he had killed him;'* the two last blows were on the left side of his head; Ray went about 17 or 18 steps for the board; the old man was a few steps from his wagon; *he was very drunk; he could not have done much harm in a fight; he had no weapon that witness* saw; Ray was running or walking very fast when he went after the board; the old man was on his horse and going east towards home; Ray either turned the lead horse, or the horse turned a little across the street; Taylor had to go about the length of a horse to where his hammer was, Ray had to go about 30 feet to where he was standing, to where the board was lying; Taylor had made but a few steps from his wagon when Ray struck him; Taylor was walking in a stooping position with his face towards

the old store, and he was so drunk that witness thinks he could not have advanced much further without falling by himself; witness thinks the usual bearing of the old man was as direct as other men of his age when sober; witness said he struck the first time with the flat side of board; Taylor said if he had broken the buggy he would either pay him for it or give him satisfaction, witness does not remember which; Taylor died the night after he was struck, witness thinks the wounds given by Ray produced his death, witness did not see the wounds. Ray appeared to be very mad after he had inflicted the blows; witness heard no threats used by him; when the two last blows were struck, witness thinks Taylor was lying on one side of his face, and made no attempt, as witness saw, to get up; Ray stood pretty much in the same position all the time, while striking the blows.

Thursday morning, cross examined: The whole rencounter did not last more than fifteen minutes, witness did not keep account of the time, but it was all done in a short time, witness can't say how many minutes, thinks Ray had time to reflect in running 150 yards, witness thinks he would have had time, or any other man in running that distance; he, Ray, did seem to stop and consider or reflect, it was all done from beginning to end without stop or hesitation; witness did not see Ray drink any, and he did not act to him like a drunken man, witness did not see any bottle in his pocket, nor did he see him take any out and throw it on the ground; Taylor got down off his horse as any other man would have got off under such circumstances, witness thinks he would have got off quicker; witness heard him, Taylor, say but very little, but he was drunk and walked like a drunk man; Taylor was a good deal larger than prisoner, don't know prisoner's age; witness does not believe that Taylor was going towards Ray at all; witness did'nt hear anything about fighting after Taylor tried to get the hammer, as witness supposes, he turned and walked towards the old store, when Ray came towards him, on his right side; in a short time after, Ray caught hold of the horse; Taylor commenced cursing Ray, saying 'God damn you, turn my horse loose;' wit-

ness does'nt recollect hearing Taylor say when dismounting from his horse, that 'he had a wagon hammer which he could use'; witness testified before the committing magistrates; he now says his testimony, taken before the magistrates, was true, as read to him by prisoner's counsel at this time; he now recollects that Taylor said, when dismounting *from his horse, that 'he had a wagon hammer which he could use'* ; Taylor at the first blow, tried to ward it off, and fell at the blow; Ray, when he struck this blow, was on the right of. Taylor—pretty much against him; it was but a short distance from the corner of the store, *to where the board was lying; Ray pitched up the board between the work-bench and the street, near the side walk; after witness hallowed to him, Ray, that he had or might kill him, Ray stopped with the board, raised to strike, and threw the board down;* there was none near enough to prevent his striking Taylor with the board; the parties were, as far as witness knows, strangers to each other, and he is ignorant of the relations previously existing between them; witness never heard of a controversy between them before this time; the reply which Ray made, when told that he had killed Taylor, was made and while Ray was in a state of excitement, a short time after the blows was stricken; it would take about a minute to walk from Holsey's to where Taylor's wagon was; they both appeared to be in a hurry; Ray was in a greater hurry than Taylor, the old man had the appearance of being drunk, and was a good deal older than Ray; witness does not know whether Ray was drunk or not; the wagon was a two horse wagon; hammers for such a wagon are made of wood or iron, but most frequently of iron, go through the double tree and tongue, and are about 6 or 8 inches long; witness has seen Taylor here in Perry several times, but as to how many times, he can't pretend to say; the work bench was not more than two or three steps from the corner of the store; witness can't now say, that at the time Ray struck Taylor, Taylor was approaching him, he might have been approaching him, and he thought so at the time, and thinks so now; Ray came up towards him on the right; there has never been any

misunderstanding or hard feelings between witness and prisoner, nor is there any now, nor has there ever been, between him and the old man, nor any of his family, so far as he knows; witness says he does not recollect of his having taken out any warrant; he stood security in the prosecution; he never took out any warrant, and if taken out in his name, it was without his approbation or consent, that he cannot read or write; Ray was the first who swore, to the best of his recollection, and that was when he took hold of the horse.

*Philip D. B. H. Culler* sworn, says: He was present and assisted at the post mortem examination of Mr. Taylor. He, Taylor, had a very large wound in the side of his head. The skull was fractured about $3\frac{1}{4}$ inches in length and $1\frac{4}{8}$ inches in width. There was another fracture in the frontal bone. Those wounds produced his death. Witness is a regular practising physician. This was sometime in February last, in this county; either of the wounds would have caused his death.

Cross-examined: The wounds were in the left side of the head, one just above the ear; there was nothing in the wound itself, which would indicate whether the deceased was standing up, or was down, when the blow was stricken; the deceased must have been lying on his right side, if he was struck while on the ground; the blow could not have been inflicted in the left side of the head, if the assailant was standing on the right side.

*William L. Franks* sworn, says: He had turned the corner from Thompson's house, coming from his own gate, and saw some person holding the lead horse of a wagon, with three horses in it, with his left hand, and bandying epithets with *Taylor, who was on the saddle horse; in a little while I saw the person holding the horse, apparently pull him round and start to run in the direction of witness; he gathered a board like the one in Court, and immediately advanced back to where Taylor was, making a halt for about a second or so about midway, and then advanced again, meeting Taylor about three steps from the saddle-horse; Taylor went towards*

*the double tree of his wagon; he stooped forward to get some-*
*thing, and his hand missed the tree, and went over beyond the*
*wagon tongue; he then made a second effort to take some-*
*thing; about that time he looked back, and saw the other per-*
*son, whom witness recognized to be the prisoner, advancing,*
*with the board in his hand, and Taylor come out from behind*
*the saddle-horse, in a stooping position; he took two or three*
*steps, and had nearly straightened himself, when Ray struck*
*him, as witness thinks, the first on the left side,* the weight of
the blow falling on the shoulder first grazing his head; this
blow was struck with the broad side of the board; Taylor's
hat fell off; and he fell from that blow; after he fell, Ray
struck him two licks with the edge of the board; witness
thinks that the bystanders called to Ray, about the time he
finished striking; witness passed on down to the Post Office, and
handed Gen. Warren a letter, and returned back to the corner
where Ray had come on the side-walk; Summerford asked
Ray why he had struck or hurt the old man, for if he had
broke his buggy, he did'nt mean to do it; *he replied, he did'nt*
*care a God damn—he would do what he had, if his neck was*
*to be stretched for it, or something like that;* in a moment or
two after, Ray threw a bottle against a tree with an oath and
broke it; Mr. John H. Powers then come up and arrested him,
and delivered him to the Marshall, Toomey; witness thinks
Taylor was standing immediately facing Ray, when he struck
him.

    Cross-examined: Witness, when first saw the parties, was
about 80 yards from them; did not hear what they were say-
ing, but both were talking, and Ray was gesticulating with his
right hand. The time occupied in the fracas was not more
than two minutes, when he first saw them, and Ray had hold
of the bridle; he saw no sign of fighting, but in a moment af-
ter, *he saw that Taylor was angry, and as soon as Ray start-*
*ed for the board, witness saw that he also was angry;* Ray,
when he got to the board, was the line of direction that wit-
ness was going in; Taylor was below it, and Ray had to cross
that line to get to him; if Taylor had stood still, and Ray had

Ray *vs.* The State.

continued to advance, he would have come up to the right shoulder of him, Taylor; if Taylor had advanced in the direction he started, when he come out from the wagon, and Ray had remained stationary, witness does not think he would have met Ray; *Taylor had, as witness thought, an old wagon whip in his left hand; Ray advanced towards him in a fighting attitude; he did not see Taylor raise his arms in a position to strike;* when Ray got within striking distance of Taylor, having the board *raised up, Taylor stopped and raised both of his arms;* Taylor's face was turned directly towards Ray, when he received the first blow; he cannot speak with accuracy as to the position of his feet and body, at that time; he thinks the work bench was in the line of witness' direction, or below it, when prisoner replied to Summerford, he was excited; he broke the bottle after his reply to Summerford; *what he did and said, was evidence of great recklessness and excitement;* witness also remarked, that prisoner smiled during this time; but it was the smile of a man that was mad or angry; after Taylor had been removed to the side-walk, and it was remarked by some one that he was a dead man, Toomey remarked, George knows me, to which prisoner replied, yes it is Toomey; his manner and tone of voice was at that time changed, as witness saw his face was pale; the prisoner was near enough to hear the remark about Taylor being dead; this conversation took place after Powers had arrested the prisoner; the breaking of the bottle, and the conversation with Summerford, took place before the prisoner was arrested, and before his manner was changed, as last stated; the change in his manner and tone of voice was noticed immediately after the remark had been made, that Taylor was dead; witness thinks that Taylor was not so drunk, but that he could have walked on, if he had not been met by Ray, and that he could have walked all over town; witness never heard of any cause of quarrel between the parties before this time; Ray did not appear to be intoxicated, but witness does not know enough about him, to know whether he was under the influence of liquor at

all or not; witness has seen Taylor walk in the same manner previously, when drunk, as he did on this occasion.

Rebuttal : The change of manner and tone of voice was noticed after the arrest of the prisoner, to the question by permission of the Court, witness answers, that *the prisoner ceased striking Taylor of his own accord, and simultaneously with the call to him, from the bystanders, to stop.*

## EVIDENCE FOR THE DEFENCE.

*Fowler Holt* sworn, says : He was present and saw a part of the rencontre between the prisoner and deceased; when witness first noticed them, *Taylor had not gotten off his horse ; Ray was standing near the horses ; some words passed about running a wagon against a buggy, which witness does not recollect; something was also said about fighting—the precise words not remembered.* But *immediately after, Taylor said, in a loud voice, God Almighty damn you, if you are for a fight come on ; after Taylor dismounted and started behind his horse, to get his wagon hammer; as he supposes, Ray went to get a board ; when Ray got it, they both came meeting each other ;* Taylor having come from behind his horses, seemingly pressed for time, he proceeded to meet Ray, and as soon as they got in striking distance of each other; Ray struck him, as witness thinks, on the top of his head, his hat being on, and knocked him down ; Taylor falling on his breast and face, he scrambles a little while on the ground, and in this position, presented the left side of his head ; Ray then turned the board in his hand, from flatwise to edgewise, and then gave him a blow on the left side of his head, with the sharp corner of the board, that seemed to sink into his brain ; *one seemed to be as anxious for a fight as the other ;* witness was calm and unexcited at the time, and looked passively on at everything that was done; from the conduct of both parties, they seemed equally to desire to fight. Witness thought at the time, that Taylor did not get the hammer, as he appeared pressed for time, and was in too great a hurry to have got it; *Ray could not, from the position of the parties, have known whether Taylor had*

Ray *vs.* The State. ,

*got the hammer or not,* at the time his back was turned; wit
ness was about the distance from the stand to the Court-house
door, further off from the parties, than where he supposes
Cooper was; witness called to the prisoner, and said, don't
strike that man any more, and he did not strike him again, as
witness thinks.    When Taylor started for the hammer, as wit
ness supposes, he said something which witness did not hear or
understand distinctly; about the time Taylor made the remark,
Ray started for the board.

Cross-examined:    It was about the distance from the stand
to the bar-door, (about forty feet,) to where Ray picked up the
board; Taylor took four or five steps from where he went be-
hind his saddle-horse, to where he and Ray met, and the blow
was stricken; the board was lying somewhere near the corner
of the old store; when witness first saw the parties, the horses
were stopped; Taylor had both his hands in a position shown
to the Jury, when he was struck.

Counsel for the defence then introduced the affidavit of Jesse
Cooper, and the warrant issued thereon, in evidence, as follows:
GEORGIA, HOUSTON COUNTY:

Before me, Wm. S. Moore, a Justice of the Peace, person-
ally came Jesse Cooper, of said county, who being duly sworn,
saith on oath, that on the fifth day of February, eighteen hun-
dred and fifty-three, at Perry in said county of Houston,
George W. Ray, Jr., of said county, did make a violent as-
sault upon the person of William F. Taylor, of said county,
with a wooden board or piece of plank, which he, the said
George W. in his hands then and there, had and held, feloni-
ously, wilfully and maliciously, did strike and inflict divers
heavy blows, upon the arm and head of him, the said William
F. Taylor, giving to the said William F. then and there, with
the board or piece of plank aforesaid, upon his head aforesaid,
one or more mortal wounds, of which said striking and blows
aforesaid, the said Wm. F. Taylor did soon after die.

Sworn to and subscribed be-⎫                    his
   fore me, Feb. 8th, 1853. ⎬        JESSE ⋈ COOPER.
     Wm. S. MOORE, J. P. ⎭                  mark.

GEORGIA, HOUSTON COUNTY:

*To Wm. H. Talton, Deputy Sheriff of said county, and to all lawful officers to execute and return:*

Whereas, Jesse Cooper of said county, hath this day made oath before me, William S. Moore, one of the Justices of the Peace for said county, that on the fifth day of February, 1853, at Perry in said county of Houston, George W. Ray, Jr., of said county, did make a violent assault upon the person of William F. Taylor, of said county, and with a wooden board or piece of plank, which he the said George W. in his hands then there had and held, feloniously, wilfully and maliciously, did strike and inflict divers heavy blows upon the arm and head of him, the said William F. Taylor, giving to the said William F. then there with the board or piece of plank aforesaid, upon his head aforesaid, one or more mortal wounds, of which said striking and blows aforesaid, the said William F. Taylor did soon thereafter die.

These are, therefore, to command you, and each of you, forthwith to apprehend him, the said George W. Ray, junior, and to bring him before me or some other Justice of the Peace of the county aforesaid, to answer to the charge of murder committed by him, upon the person of the said William F. Taylor, on the said fifth day of February instant, and to be further dealt with as the law directs.

Hereof fail not, and have you then and there this warrant.
    Given under my hand and seal, this Feb'y 8th, 1853.
                WM. S. MOORE, J. P. [L. S.]

I have executed the within warrant by taking the body of the within named George W. Ray, junior, and have him before William S. Moore and David M. Brown, Justices of the Peace for the county of Houston.
                W. H. TALTON, Dep'y Sh'ff.
February 8th, 1853.

Filed in office, February 8th, 1853.
                W. H. MILLER, Cl'k.

*Marcus Dudley* sworn, says : He came to Oglethorpe by way of Fort Valley, that day, with prisoner, to the house of prisoner's father; when we arrived at Fort Valley, witness and prisoner came on to town with a negro of his father's, with a buggy which they hired, with them, witness and the negro both weighed about 183 pounds; prisoner was drinking all the way from Oglethorpe home, he had a bottle of liquor with him; they arrived at old Mr. Ray's about four or five o'clock, and witness remained there until dark—heard of the difficulty about an hour and a half after he got there. The prisoner was drunk when they parted; prisoner was raised in the western part of the county, and Taylor lived in the eastern part; witness does not know that the parties were acquainted; witness and prisoner are well acquainted—has been in his company a great deal in the last five or six years, and he never heard of a difficulty between them previous to this time; prisoner is a young man, and Taylor was an old one.

Cross-examined : Witness is twenty years old. He was raised in Perry; his acquaintance commenced with Ray, the prisoner, when his father first removed to Perry, about five or six years ago; his knowledge of where prisoner was raised, is derived from what he heard prisoner's father say; prisoner drank out of one bottle all the time, but did not drink it up on the way from Oglethorpe; the bottle was a flask which held over a pint; witness drank one or two drinks with him, but does not remember how many; if he had drank as much as Ray he would have been intoxicated; witness is certain that the negro did not drink with prisoner—is certain that if he had drank, he would have seen him, but did not have his eye upon the negro all the time; the negro is fond of liquor, but witness never saw him drunk, though he has seen him drink a good deal, prisoner was very drunk; the negro drove all the way from Fort Valley; prisoner and witness remained in Fort Valley about five minutes; witness left on foot; was overtaken in about half an hour by prisoner and the negro with the buggy; prisoner was absent occasionally during the last year, at Hanesville and Fort Valley, painting.

Rebuttal: Prisoner drank some at Oglethorpe, he also took a drink at Marshalville with Joe Hinson, he had time at Fort Valley to take two or three drinks; while they were travelling whenever Ray was going to drink, he would say so, and sometimes would drink with him; unless the negro drank at Fort Valley, or before they overtook witness, witness does not think he could have drunk without his having seen him do so; old Mr. Ray always come to town from towards the western side of the county; never saw young Ray in Perry till his father removed here.

*William D. Dey* sworn, says: Saw prisoner on the day of the rencountre, he took one drink after he came in; Taylor had been in the grocery before Ray came in; Ray and the negro drove up and stopped before the grocery, and then¹ Ray came in and called for a drink; some one told him that that old man had broke his buggy; he went immediately out, and a short time afterwards, not more than a minute, witness heard of the difficulty between prisoner and deceased; Taylor had been in the grocery before dinner; witness did not see him and Ray together and knows of no quarrel or acquaintance with them; prisoner remained in the grocery about five minutes before he went out.

Cross-examined: It was about 120 yards from the grocery to where the difficulty took place; it is across a square, a half square or a street.

*Elijah M. Hulsey* sworn, says: Recollects to have seen prisoner before the difficulty, he was in a buggy; saw that he had a bottle of liquor in his pocket, and witness saw that he was intoxicated, to what extent he did not know; after a conversation with him, Ray went into the grocery. Taylor was about there at the time, and when Ray and the negro came up, and Ray went into the grocery, Taylor was squatted down between the grocery and dry goods store; it was about a half hour after this that witness heard of the difficulty; did not see the negro get out of the buggy; Taylor lived twelve miles east of Perry, and Ray at his father's when at home; witness is not aware of any quarrel or animosity between them, and knows of no pre-

Ray *vs.* The State.

vious difficulty between them, nor there being ever a quarrel with each other before that time; the street was wide enough for a half a dozen wagons to pass if they were to crowd up; the buggy was below the wagon when witness saw it; the street is nearly as wide before the grocery, as where witness saw the buggy; witness does not know that there were any other buggies or wagons in that part of the street; the wagon was about opposite the dry goods store; the grocery is above the dry goods store; the wagon being a little below the bar-room door, witness examined the wheels and found the hub shattered.

Cross-examined: Wm. Dey, the witness already sworn, was clerk at the bar-room—there is only one bar-room about there.

*Jesse Bell* sworn, says: He has known old Mr. Ray ever since 1840, before he removed to the neighborhood of Perry— he lived about 8½ miles from Perry; does not know whether Taylor visited the town frequently or not; witness has lived here about twenty years, and frequently visited the place before; has not often seen Taylor here; never knew or heard of a difficulty between the parties, previous to this.

*John J. Glover* sworn, says: Examined the buggy said to be Ray's, and saw the wheel mashed down so that it could not be used; heard of the difficulty about ten minutes before this; the buggy was drawn quartering across the street, the horses' head before the grocery door; there was plenty of room to have passed the buggy in the street, without striking; it was usual for buggies to be stopped before the door; a part of the hub was apparently cracked from some previous injury, about half way round; knew of no difficulty between the parties previous.

*Mitchell H. Taylor* sworn, says: Was in town the day the difficulty took place; saw the wagon and buggy; the buggy was at the bar-room door; the wagon was below it; saw them immediately before the wagon passed the buggy, and immediately after; the buggy wheels were hardly at the edge of the road, but may have been, shortly after Taylor had passed it; Taylor did not turn his head; witness did not examine the buggy before nor afterwards; witness does not know whether the

buggy was broken or not; there was no other wagon that passed about that time, that could have broken the buggy; it was very soon, not more than four or five minutes, after the wagon passed the buggy, before prisoner came out of the grocery.

Cross-examined: Saw prisoner come out of the grocery and go up the street—he might have walked eight or ten steps—but after that, he struck a trot; Taylor was going on peaceably and did not turn his head.

*Michael J. King* sworn, says: Was in town the day of the difficulty; was at the grocery after prisoner had driven up; it was announced to prisoner that his buggy was broken down; prisoner said to witness, after he had the man pointed out who had broken the buggy, that he would exact payment from him to the extent of the injury; prisoner went right off as he spoke to witness.

It was here announced by State's counsel, that the buggy was broken by Taylor's wagon running against it.

*John R. Cook* sworn, says: That he saw the buggy's wheel, and that the cost of repairs was $6 00.

Cross-examined: Witness made a new wheel, and had the old tire put on.

In rebuttal: Witness made a new wheel, because the old one was so badly injured that it could not be well repaired.

*Ephraim Mann* sworn, says: He saw pretty much of the difficulty. In the first place, *saw prisoner take Taylor's horse by the bridle, and said something about a buggy. Taylor replied, damn you why didn't you take your buggy out of the road? Ray replied in a low tone, when Taylor said, if fighting is what you are after, I'll be with you. The old man then commenced getting down off his horse; he started round behind his saddle horse, and prisoner ran across the street, towards Thompson's old store. The first boisterous language and the first oath used, that witness heard, was by Taylor, as above stated; something was said before, but it was so low that witness did not hear it distinctly.*

Cross-examined: Witness was about thirty yards off when

he saw prisoner take Taylor's horse by the bridle; he walked towards them until he got to the post before Thompson's store, before witness heard the boisterous language; there were some other words passed between the parties, which witness did not hear; witness thinks that Mr. Cooper was nearer to the parties than he was.

Rebuttal: Witness did not hear the old man proffer to pay for any injury done to the buggy.

### EVIDENCE IN REBUTTAL FOR THE STATE.

*George W. Singleton* sworn, says: He saw prisoner immediately after the difficulty, saw no signs of intoxication; has known him for one, two or three years.

Cross-examined: Can't say, positively, that he was not under the influence of liquor.

*Samuel D. Keller* sworn, says: He recognizes the warrant issued for the arrest of the prisoner; it is in his hand-writing; Cooper was brought into his office, at his suggestion, by authority of the Justices of the Peace; Cooper signed the affidavit prepared; Cooper had no other connection with the warrant; he has no knowledge of legal forms; Taylor is the prosecutor; Cooper refused to have any thing more to do with it, and reluctantly consented to sign the bond as security; Taylor applied to witness for the warrant, and Cooper was sent for as a witness to the transaction; witness saw the prisoner that day; thought he had been drinking, but he walked steadily, and witness was satisfied that he was not very drunk.

Cross-examined: Never saw prisoner down drunk, but has often seen more drunk than he was that day. Witness, from seeing papers drawn according to the form that these were, would not have necessarily supposed that Cooper was the prosecutor.

*John G. White* sworn, says: Saw Ray that day, took him to be sober, saw him go into the grocery, and come out and go up the street; *Taylor, when he struck the buggy, went on and did not look back; his wagon hub caught in the rim of the buggy, as it stood standing across the road.* Witness ex-

amined the buggy, it was an old crazy hub; if it had been sound, the collision would not have damaged it one cent; some person went back and pushed it up, and a half-a-dozen nails would have made it as good as it was before; the tire did not come off, but was taken off by witness, and afterwards put on the new wheel; saw nothing of the spokes being jerked out by the wagon.

Cross-examined: Is positive that the prisoner was sober; father of prisoner and witness have had fights to keep old man Ray from killing him; never had any difficulty with prisoner; has said that he thought prisoner ought to be hung; he does not believe that prisoner started with the intention to kill Taylor; prisoner started immediately, and the rencontre took place right off. Witness does not think Taylor was sober; did not see either of them drink, but thought Taylor had been drinking; the parties may have been sober, he cannot tell whether they were or not; witness saw both of them go in and come out of the shop.

*William Summerford* sworn, says: He saw the prisoner just before the difficulty, had a conversation with him, and thought he was sober; he talked mild and rational; if he was drinking, witness didn't detect it; conversed with him after the difficulty; he then had the appearance of being somewhat in liquor. It was fifteen or twenty minutes before the difficulty the witness first conversed with prisoner.

Cross-examined—Re-called by the State: Witness is well acquainted with prisoner, having known him from a small boy.

Cross-examined: Never heard of any difficulty, and knew of no acquaintance between the parties.

Counsel for the prisoner requested the Court to charge the Jury, that "if a quarrel ensued between the deceased and prisoner, and the deceased, after having threatened to make use of his waggon hammer, and attempted to get it—though he may have failed—and advanced to meet the prisoner, for the purpose of fighting; and the prisoner, after or about the time deceased declared his intention to get his hammer, and started to do so, went hastily a short distance, and snatched up a board or

Ray *vs.* The State.

plank, and the prisoner and deceased met, with the mutual design of fighting, both having advanced for that purpose, and the blows which were given by prisoner, were given under the excitement of the quarrel and rencontre, with an intention only to chastise or beat, and not from any deliberate intention to kill, and all this was done by prisoner in a hurry, from the beginning to end, without consideration or reflection, malice will not be implied, and the prisoner is not guilty of murder".

The Court declined so to charge, in the language requested, but charged as follows:

"That malice was essential to the crime of murder, either express or implied. (The Court then read the definitions of malice, in the Penal Code, and also the cases cited in *Blackstone*, on that head.) That the text from *Blackstone*, was read only to assist them in comprehending the definitions in the Penal Code, which was, to them, the conclusive rule of law, in determining malice, either express or implied. Take these rules, and apply to them the facts in this case. If all the facts exist, as contained in the charge requested, or if less than these, or more than these, or in a different order, from the whole together, as in evidence before you, must your minds be made up, as to the existence of malice. If you believe there is no express malice proven, then malice should not be implied —if the prisoner had received any considerable provocation, or all the circumstances of the killing did not show an abandoned and malignant heart on the part of the prisoner. But if you believe, from all the evidence taken together, that the prisoner had received no considerable provocation, or all the circumstances of the killing, showed the dictates of an abandoned and malignant heart, then malice was implied in law, and prisoner guilty of murder".

To this refusal to charge, and charge as given, defendant excepted.

The prisoner being found "guilty", a motion was made for a new trial, among other grounds:

Because Samuel Gunn, one of the Jurors, was not impartial, and a competent Juror, having formed and expressed an opin-

ion before his being impannelled, (and unknown to the prisoner and his counsel,) "that a Jury could not be found in the county, who would not find Ray guilty of murder; that he knew deceased well—was in the army with him; that he was a good man, except that he would get drunk occasionally; and that Ray had killed him without cause; and that if Ray could be acquitted, there would be no use for laws, &c".

In support of this ground, were filed the affidavits of two citizens, who heard the Juror use the expressions, at a former term, when the cause was continued; and the affidavits of prisoner and his counsel, as to their ignorance of the fact, until after the trial. In rebuttal, the Sol. Gen'l filed the affidavit of the Juror, that he did not recollect saying that "Ray had killed Taylor without cause, and that if he was acquitted, there would be no use for laws"; that he did express the other opinion, at the time the cause was continued, on the ground of the public excitement in the county; that it was formed from reports and excitement, and did not prejudice or bias his mind, or affect his verdict; that he was prepared to hear the evidence patiently, and find a verdict accordingly, &c.; that all of his fellow-jurors agreed immediately on retiring to the room, upon a verdict of "guilty", and that he alone had doubts, and for some time kept the Jury in their room, until, upon a closer examination of the evidence, he consented to the verdict.

The affidavits of two other Jurors, corroborated Gunn's affidavit, as to his being the only Juror that doubted the propriety of the verdict.

Another ground of the motion for a new trial, was that the verdict was contrary to law, and contrary to the evidence in the case.

The Court refused the motion for a new trial, and to this decision, defendant excepted.

Upon these exceptions, error is assigned.

GILES & E. WARREN, for plaintiff in error.

Sol. Gen'l DeGRAFFENREID, for the State.

Ray *vs.* The State.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] The charge which was asked for by the counsel for the prisoner in this case, and which was refused by the Court, was not in apt and accurate words, for purposes of instruction to the Jury. The modification made by the Court, was judicious; and the charge as given, so far as we can tell from the record, was not exceptionable.

[2.] Upon consideration of the motion for a new trial, affidavits were presented, showing that Samuel Gunn, one of the Jurors who had tried the case, had previously expressed opinions unfavorable to the prisoner; and that the knowledge of this fact had not been obtained by the prisoner or his counsel, until after the trial.

Such a showing, without explanation, would entitle the prisoner to a new trial. But the Juror was heard, by affidavit, in his own vindication; and he states, that he expressed the opinions attributed to him, under the influence of reports, and from excitement; that they did not prejudice or bias his mind, or affect his verdict; that he was prepared to hear the evidence patiently, and find a verdict according to all the evidence, &c.; that all his fellow-jurors were in favor of a verdict of guilty, upon retiring to the jury-room, and he alone had doubts and hesitation, until they "were removed, by carefully considering the evidence". Some of his fellow-jurors, by affidavit, corroborate this last statement.

[3.] The propriety of permitting the Juror to offer explanatory matter, in vindication of himself, as this Juror has done, has been recognized by this Court, in *Monroe's case,* (5 *Ga. R.* 85); and in the recent case of *John Anderson vs. The State,* decided at the last term of this Court, at Columbus.— And we have held, that when a Juror is thus heard, after verdict, the Court should place itself, as it were, in the position of triors; and if the Juror's explanation be such as, in its opinion, should render him competent, if he were before triors, the Court should so pronounce him.

Looking at these affidavits from this point of view, we think this Juror was not disqualified by the expressions which he had used; and that the Court was right in refusing a new trial on this ground.

[4.] The motion for a new trial was placed also upon the ground, that the verdict was contrary to the evidence; that there was no evidence of malice, express or implied, in this homicide; and that the Jury should not have found the prisoner guilty of a higher crime than voluntary man-slaughter.

It is not pretended that there was any evidence of *express* malice to be found in this record. But the case is put entirely upon the evidence of *implied* malice, which it is said appears there.

Our Penal Code declares, that "malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart."

Let us inquire then, 1. Was there no considerable provocation here? 2. Did the circumstances of the killing show an abandoned and malignant heart?

We learn from the record, that at the time when this difficulty commenced, a buggy of the prisoner, or one that he had in charge, stood before the door of a grocery in the town of Perry, in which the prisoner was; that the decedent recklessly, (as there was abundance of room for him to have avoided it,) struck against this buggy with the wheel of a wagon which he was driving, and did some damage to it; that information was communicated immediately to the prisoner, who instantly left the house, hastened rapidly after decedent, who was moving on with his team, and overtook him, after going some 150 yards.

And now to answer the questions which we submit, let us look to the strongest testimony against the prisoner, for what ensued, viz: that of Jesse Cooper, the principal witness for the State. What do we learn from *him* of the provocation ?

He testifies, that the prisoner ran up, as we have stated, seized one of the decedent's horses, stopped the wagon—in his passion, cursed decedent for breaking his buggy, and demanded pay-

Ray *vs.* The State.

ment for it.   Was his passion appeased by what decedent said or did ?   According to this witness, the latter said, if he had broken the buggy, he had done it accidentally and would pay for it.   But did he say this in a way which was calculated to soothe or to irritate Ray still further ?   That the reply must have been in manner and spirit of the latter character, is probable, from the still more angry reply of Ray, and his threat to whip him if he did not pay "right then".   It is also probable, from decedent's intoxication—from his recklessness in driving against the buggy, and from his subsequent readiness to quarrel and fight ; for he instantly said, that "if that (a fight) was what prisoner was up to, he would have a hand with him ".   Without words of regret, on account of what he had done, on account of the *first* wrong in the transaction ; at all events, without words of this sort expressed, in a way which might conciliate, he manifested a quarrelsome and pugnacious spirit—threatened the employment of a weapon, or something like it ; for he " said he had a wagon-hammer he could use " ; (this the witness admitted upon the cross-examination ;) got off his horse—went, as the witness supposes, to get this hammer, but failing to get it, moved towards prisoner, (for on the cross-examination, the witness says : "Taylor might have been approaching him, (prisoner,) he thought so at the time, and thinks so now",) when he received the prisoner's blows.   In the meantime, still smarting under a sense of the injury done to him, by the breaking of his buggy—incensed by decedent's manner, as prisoner no doubt thought, of persisting in injustice —irritated and maddened by the offers of the latter to fight, and his movements to procure a dangerous implement for the purpose, the prisoner ran rapidly to a board which lay near, seized it, rushed upon the decedent and struck the fatal blows.

We do not hesitate to say, that such circumstances show a considerable—a very exasperating provocation.   They present a stronger case of provocation, in our opinion, than that which appears in *Lanure's case*, (1 *East, P. C.* 233,) where one, violently, and with insolence, whipped the horse of another out of his way, and the rider alighted, and immediately, in the fight

which ensued, killed the assailant.    This was held to be man-slaughter, on account of the provocation.

To this testimony of Cooper, let us add the evidence of Franks, going to show decedent's efforts to get the hammer ; the evidence that decedent must have been meeting prisoner afterwards, from the fact that the board picked up by the lat-ter was near the store, and that decedent was going towards the store when Ray met him ; the testimony of Dr. Holt, that the prisoner, from his position, could not have known whether or not decedent had gotten the hammer, (which leaves the in-ference that he may have supposed decedent had it,); the state-ments of the same witness, that they "were both meeting each other "; that "he (decedent) proceeded to meet Ray", &c. ; that "one seemed to be as anxious for the fight as the other", &c.

These facts greatly strengthen the view we have taken, and to our minds, make the conclusion very plain, that there was considerable provocation on the part of the decedent ; that there was great heat of blood between the parties, and some-thing of mutual intention to fight.

[5.] In forming this opinion, we have not been unmindful that, according to law, the provocation which reduces such a homicide to voluntary manslaughter, must be one that involves some assault by the party killed upon the person killing.

We think such assault may be found in this case, in the in-tention of the decedent to resort to violence, when it was unne-cessary ; is to be found in the evidence which shows a mutual design to fight, and in the fact that the decedent was approach-ing the prisoner in furtherance of this design.

[6.] Our next question was, do we find in this evidence, proof that the prisoner was influenced by an abandoned and malignant heart, in the sense in which the law uses these terms ?

This is commonly held to be evinced by a weapon, or other appliance likely to produce death, and by brutal and blood-thirsty use of such instrumentality.

In this case, there was no bowie-knife, dirk, or pistol, or

other such instrument, employed by the prisoner, which he had been previously carrying, and which, accordingly, might be regarded as manifesting "a heart fatally bent on mischief, and desperately at enmity with all mankind"; but the instrument used was a board (heavy enough, no doubt, easily to destroy life, if applied with violence,) which had not been previously provided by the prisoner, but accidentally lay at hand; was perhaps, the nearest thing of the sort to him, and was hastily taken up. Nor is there anything in the record to authorize the belief, that if this instrument had been slighter and less dangerous, and not likely, on that account, to produce death, the prisoner would have passed it by for the purpose of procuring a weapon more deadly.

It should be added, too, that after he had stricken the blows which he inflicted, when called on to desist, though in the act of again striking, and even with the board raised for this purpose, he did desist, and threw it down.

We feel it our duty to observe, however, that though, in our opinion, there is, in this testimony, no evidence of a malignant intention on the part of the prisoner, to take away the life of the unfortunate decedent, yet, the homicide is not without features of considerable brutality. There was no necessity, whatever, that the prisoner should have resorted to the degree of violence which he employed. The decedent was aged—was intoxicated—was almost incapacitated to have inflicted any very great bodily harm on the prisoner. The beating, therefore, was barbarously cruel. The shocking and profane language, too, used by the prisoner, after he was informed that the victim of his passion was no more, serves to darken the coloring in the ghastly picture of his transgression.

In consideration of these things, we would be glad to see a penalty more severe than that which is attached to the crime of man-slaughter, visited upon this prisoner. But we are not prepared, for the reasons we have given, to say that this unhappy young man should suffer the same punishment, appointed to him who, in cold blood, and deliberately, destroys the life of

his victim, or to the homicide, who in the absence of considerable provocation, and with sanguinary recklessness, uses a deadly weapon, or other instrumentality, because it is, in its nature, likely to produce death. We therefore send this case back to the Jury.