Bob. McMillan, (a person of color,) plaintiff in error, vs. The State of Georgia, defendant in error.

[1] To make a homicide murder, malice must exist at the time of the killing.
[2] Unless the finding of the Jury be clearly wrong, this Court will not disturb the verdict.
[3] The verdict in this case was not contrary to the evidence.

Murder. In Macon Superior Court. Tried before Judge Cole. September Term, 1866.

The plaintiff in error was tried for the murder of Dianer Holcombe, a woman of color.

*Evidence for the State.*

*Mack Felton, colored*—Knows the prisoner, and points him out. Was waked by his wife about twelve o'clock at night on the 29th of July last (1866.) Judge came round to his house, calling him. We turned in the direction of the calling, and met the deceased, Dianer, with her throat cut, at the corner of the house occupied by deceased. She came to his steps and sat down, where she remained till she died. She lived three or four minutes. About one-quarter of an hour afterwards, he went into the house of deceased, and found Bob with his throat cut. No one occupied the house

of deceased but Dianer and Bob and Dianer's children. Bob did not seem badly hurt at first, but, after a while, began to act like he was dying. Dianer's son, Judge, was with her when witness first met her.

*Cross-Examined*—Witness saw no one else in the house with Bob. Bob was wounded in the abdomen, apparently with a knife, by a slight gash.

*Judge Holcombe, colored*—Knows the prisoner and points him out. Was present at the killing. Dianer was his mother. On that night, he staid in his mother's house. The killing occurred about eleven or twelve o'clock at night. Was asleep when it commenced. The blood falling from his mother's throat awoke him. He jumped up, and his mother was turning round in the middle of the floor. She then ran out, and he followed. He heard no noise in the house, except that of the blood from his mother. Six other children were in the house, none of whom were awake when he awoke. On the night of the occasion, when he went to bed, he left Bob sitting up His mother was asleep when he went to the house that night, and he awoke her to ask her for his clothes. He does not know whether she was asleep or not when he went to bed. Bob always kept a razor in his house. On the night of the killing, after the killing, he saw Bob's razor on the hearth, bloody. Bob kept his razor at the head of the bed, on a little shelf. He saw Bob's knife, bloody, under the bed. Bob and Dianer had quarreled before they parted, a week before that time. He had seen Bob strike her before they parted. Bob stayed with her part of the nights after they had parted. Bob stated that the cause of the separation was a letter which she received from the father of her youngest child. Not quite half an hour after he came out of the house, he returned with Ben, and saw Bob, lying, with his throat cut.

*Cross-Examined*—His mother and Bob had been parted about one week. Bob remained in the house after the separation. Bob was on the bed with his mother when he came home that night. Bob never carried his clothes away from

his mother's house. His mother objected to Bob's staying in the house with her. Bob was badly cut when he went back into the house—was cut across the throat, and in two or three places on the body. The cause of the separation was a letter received by his mother from the father of her youngest child. His mother continued to cook and wash for Bob, Bob paying her for this service.

*Re-Examined*—When he opened the door that night, Bob slipped off of his mother's bed. After they parted, she would not allow Bob to sleep with her. Bob wanted to come back, and she objected. One night, about two hours before day, he heard Bob trying to go to bed to his mother. She objected, and Bob went out of the house. He closed the door that night when he came home. That night, when he was awakened by the noise of his mother's blood, he went to the door, and found it latched. No one could have opened it from the outside when it was latched. It was not latched when he came home, but he latched it after he came into the house. There was another door to the house, and this door was latched on the inside, and could not be opened from the outside. (The knife and razor shown to prisoner (?) and identified as Bob's property.) Bob whetted the razor on Sunday before the killing, and did not use it afterwards.

*Cross-Examined*—When witness came home that night, he brought a light with him, and looked around, after having latched the door his mother had left open for him, to see if the other door was latched, and found it was.

*L. M. Felton*—This killing occurred on his place. When he first got there, Mr. Wilkinson had a large light in front of the house where the killing occurred. The house was divided by a partition, and had a chimney in the middle. He saw deceased sitting on the steps of one room of the same building. She had fallen back on the steps, and was dead. He then went to the other room, and found a boy sitting at the door, guarding it, with a light in his hand. He entered the room, and found Bob lying on the floor, apparently dead. He examined his pulse, and found it strong.

Shortly afterwards, asked him the question: "Bob, did you kill Dianer?" Bob muttered out something which he did not understand. He repeated the question, and Bob nodded his head in the affirmative. After considerable effort, he made witness understand that she had stabbed him with a knife. After daylight, near sun-up, he went and had a second conversation with Bob. He, Bob, stated that he was sitting in a chair near the door. He got up and went to the bed, put his hand on Dianer's ankle, and moved it up towards her body. He, Bob, cried out, "You struck me;" and Bob then said he would cut her, and reached his hand to a little shelf at the head of the bed, and got his razor, and made a stroke at her, but missed her. She fell over a chair, and then he made a second stroke and cut her throat. The strokes were both made after she got out of the bed. He then said he cut his own throat. He explained, or caused witness to understand, that the cuts on his side were so deep that the air escaped from them.

*Cross-Examined*—Bob had three wounds, or four. They were on the body—appeared to be only excisions (?) made by a sharp or pointed instrument, skin deep. The wound on the throat was not very dangerous, but might have been, if neglected. For some time previous to the killing, the parties, Dianer and Bob, had lived very unhappily together, and Bob was jealous of his wife.

*Re-Examined*—Examined Bob's clothes. There was considerable blood on his pantaloons—looked as though they had been handled by bloody hands. The knife was found under the bed, and was bloody. There was no weapon in the hands or about the person of Dianer. The wound on her neck was a smooth cut, as if made with a sharp instrument. That on Bob's neck seemed to have been made with a dull weapon. The razor was found in the ashes in the fire place. The pantaloons were found about six steps from the house. There was blood in each of the pockets.

*Crossed-Examined*—Witness cannot state that the pantaloons were Bob's. They were about twenty feet from the

house.   The confessions of Bob were made to witness voluntarily, without any threat or promise whatever.

*R. F. Baldwin*—The next morning after breakfast, he went to the place of the killing.   He went into the house where Bob was, and Bob stated to him that he went to the bed where Dianer was, and put his hands on her, and she cut him, and he complained of her.   He put his hands on her again, and she cut him again.   He then said he would cut her, and reached forth his hand to get his razor, and she got out of the bed.   He struck at her and missed her.   She · stumbled and he stumbled.   He then made the second attempt to cut her, and succeeded.   Bob said, the first lick he didn't get her, but the second lick he did get her.

*Judge, recalled*—He saw the pantaloons about ten steps from the house.   They were Bob's.

The Court charged the jury, that it was not necessary to show that malice existed any·length of time previous to the commission of the offence, but that there must be malice to constitute the offence, which might have arisen simultaneously with the offence.   Also, that while the divorce granted by the Agent of the Freedmen's Bureau was not legal, and of no force, still, if the parties had separated by mutual consent, the prisoner had no right to approach the bed of deceased, or place his hands upon her person.

After a verdict of guilty, the prisoner moved for a new trial, on the grounds :

1, 2. Because the Court erred in charging as above.

3. Because the verdict was contrary to the charge.

4. Because the verdict was contrary to the evidence and to law.

The Court refused a new trial, and this is alleged as error.

Cook, for plaintiff in error.

Bass, Solicitor General, for the State.

Walker, J.

[1.] Was the charge of the Court correct? The Judge instructed the jury "that it was not necessary to show that malice had existed any length of time previous to the commission of the offence, but *there must be malice* to constitute the offence, which might have arisen simultaneously with the offence." The charge amounts simply to this: that malice must exist *at the time of the killing;* that is, malice in the legal acceptation of that term; and it need not have existed any length of time previously. Was the killing done under a state of feeling, on the part of the slayer, which the law denominates malice? If so, the killing would be murder. Whether malice be express or implied, if the killing resulted from either, the crime is the same. Malice shall be implied, where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

[2.] It is insisted that it was shown here that the deceased assaulted the defendant, and that, therefore, the killing was voluntary manslaughter only, and not murder. Whether there was any assault made on defendant or not, was a question for the determination of the jury, and unless their finding be clearly wrong, we should not disturb it. *Revel vs. The State,* 26 *Ga. R.* 276. In this case, *page* 282, the Court says: "The jury are made the judges of the law as well as of the facts in criminal cases. Neither this nor any other Court should suffer a person to be deprived of his life, where his guilt is not fully established. Is this case so clear as to warrant, much more to demand, the interference of this Court? We think not. On the contrary, we must say the testimony authorizes the verdict. No justification is shown for the killing." And so we say in this case. But even if there had been an assault shown, was the assault such as to free the defendant from the crime of murder? *Roscoe's Cr. Ev.* 726, says: "Although, under circumstances, an assault by the deceased upon the prisoner may be sufficient to rebut the general presumption of malice arising from the killing, yet it must not be understood that every trivial provoca-

tion which, in point of law, amounts to an assault, or even a blow, will, as a matter of course, reduce the crime to manslaughter. For when the punishment inflicted for a slight transgression of any sort, is outrageous in its nature, either in the manner or continuance of it, and beyond all proportion to the offence, it is rather to be considered as the effect of a diabolical malignity than of human frailty, and is one of the symptoms of that which the law denominates malice, and the crime will amount to murder, notwithstanding such provocation. "Barbarity," says Lord Holt, (*Keat's Case Comb.* 408,) "will often make malice." 1 *East. P. C.* 234; 1 *Russ*, by *Grea.* 515 (1). If, without adequate provocation, a person strikes another with a deadly weapon, likely to produce death, although he had no previous malice against the party, yet he is to be presumed to have had such malice at the moment, from the circumstances, and he is guilty of murder." 1 *Rus.* on *Cr.* 514.

It is insisted that the Court erred in the charge, that if the parties had separated by mutual consent, the prisoner had no right to approach the bed of the deceased, or place his hand upon her person. The ground of this objection is that it did not appear by the evidence that the parties had *agreed* to separate. The evidence does show they had for some time previous to the killing, lived very unhappily together, and had, in fact, separated. The jury could determine whether the separation was by mutual consent, better than we can, and we are not disposed to disturb their finding. It is not denied that the charge contains sound law; the only complaint is that there were no facts to justify it. We think the jury might very well find that the parties, by agreement, had separated.

[3.] Was the verdict contrary to the evidence and the law? There were two theories of the real facts of the case. The defence insisted that the account which Bob gave of the transaction, being introduced by the State, should control; that, according to that account, it was a case of manslaughter, and that the jury, in finding a verdict of mur-

der, committed such an error as to require the interference
of this Court. On the other hand, the prosecution insists
that while the defendant's sayings are evidence, they are not
conclusive, and that other facts in the case show that his
account of the transaction is not the true one, but was
framed for the purpose of justifying his conduct. It is fur-
ther insisted, that as the jury have passed on the merits of
this question, there is no such error in their finding as to re-
quire this Court to set it aside. The theory of the prosecu-
tion is that defendant killed deceased in a fit of jealousy, for
refusing to gratify his lusts, such refusal being caused, as he
supposed, by her fondness for another—the father of her
youngest child—and without any sort of justification; and
then attempted to manufacture such a state of facts as would
make it appear that she was the aggressor. In support of
this theory, it is insisted that but two weapons, the *knife*
and *razor* of *defendant*, were found, both bloody; and the
pants of defendant looked as if they had been handled by
bloody hands, and there was blood in each pocket of the
pantaloons. From these facts the inference is drawn, that
defendant, after cutting the throat of deceased, made the
slight cuts, or "slight gash," as Mack Felton calls it, on his
body, which appeared to have been made with a *sharp* in-
strument, "skin deep;" and that he then, with his hands
reeking with the life blood of deceased, took his knife out
of his pantaloons pocket and with that cut his own throat,
and threw the knife under the bed, for the purpose of mak-
ing it appear that it had been used by deceased. The fact
that the wound on defendant's neck seemed to have been
made by a *dull* instrument, is relied on to show that the
*knife* may have been used by defendant in cutting his own
throat, for if the *razor* had been used, the cut would have
appeared *smooth*. These facts and inferences are relied on
to show that the jury were justified in disbelieving the
account given by defendant, and in finding contrary thereto.
The homicide was not denied, and the only testimony to re-
duce the grade below murder was the sayings of defendant,

and the jury thought these were not credible. It is insisted that defendant was *acting a part*, as shown by the fact that he appeared to be dead, although his pulse was strong—mumbled out something, although the wound on the neck was not very dangerous; and, besides this, it is insisted that the deceased was trying to get away from him when he cut her throat, even according to his own statements, and that his conduct showed a reckless brutality wholly without excuse. Judge LUMPKIN and I think this is precisely the sort of case which should be left to the decision of the jury. They are in a better position to judge of the real facts than we possibly can be; and as one theory of the facts, and one pretty well supported by the evidence, too, will uphold the finding, we do not think that this finding is so clearly wrong as to make it our duty to interfere. Indeed, we think the verdict is right; that the defendant, urged on by his lusts, was endeavoring to gratify his desires; that being denied this, and acting from feelings of jealousy, he took the life of this helpless woman as she was endeavoring to escape from him. He had struck her before they parted, which shows the brutality of his character; and now, after she had left her bed to get out of his way, he struck at her with his razor and missed her; she stumbled, and he struck at her again and cut her throat, inflicting a wound of which she died in a few minutes. Is this manslaughter? Must we say this conviction is so clearly wrong that we will set it aside? I do not think it is our duty to do so.

Judge HARRIS thinks the account given by the defendant of the transaction is the true one, and that the verdict should have been one for voluntary manslaughter, and for this reason, as I understand his position, cannot concur in the judgment which we render, affirming the judgment of the Court below.

Judgment affirmed.

HARRIS, J. dissented.