### ISON *v.* THE STATE.

1. On the trial of a defendant charged with murder, if the evidence authorizes a finding that the accused and the deceased upon a sudden quarrel, each being armed with a deadly weapon, mutually engaged in a mortal combat, each using his weapon and intending to kill the other therewith, it is erroneous for the judge, with or without a request, to omit to charge the jury on the law of voluntary manslaughter as relating to the doctrine of mutual combat; and to charge generally on voluntary manslaughter so as to eliminate from their consideration the doctrine of mutual combat. The evidence in this case was sufficient

to authorize a finding that the defendant and the deceased were en-. gaged in mutual combat in circumstances pointed out above; and the defendant having been convicted of murder, the error of the court in the omission to charge and the charge as given, as indicated above, is sufficient to cause a new trial.

2. As the judgment of the trial court will be reversed, no ruling will be made as to the sufficiency of the evidence to support the verdict, or as to a refusal of a new trial on the ground of alleged newly discovered evidence.

No. 3132.   OCTOBER 11, 1922.

Indictment for murder. Before Judge Searcy. Spalding superior court. February 24, 1922.

Grover Ison was convicted of the murder of Charlie Coggins, under an indictment which alleged that the homicide was committed by shooting the deceased with a pistol. The exception is to a judgment refusing the defendant's motion for a new trial. The first five special grounds of the motion for new trial are based on the omission of the judge, without any written request, to instruct the jury upon the law of voluntary manslaughter based on the theory that the homicide was the result of a mutual combat between the defendant and the deceased at the time the fatal wound was inflicted. The sixth ground assigns error upon a charge as given, on the ground that it excluded from consideration of the jury the question of voluntary manslaughter on the basis of mutual combat; it being contended in that and in the five preceding grounds that there was evidence from which the jury might have found that the homicide was committed in the progress of mutual combat between the parties. The seventh ground relates to alleged newly discovered evidence.

The evidence, so far as material to be stated, was substantially as follows: The homicide occurred in Spalding County at Digby's store, which was operated by Frank Moody. The store fronts on the public road between Griffin and Senoia, at a point where that road is intersected by another road. For some time past a "homemade" baseball bat, which was a weapon likely to produce death when used in a particular manner, had been kept in the store near the front door, and it was in its accustomed position on the day of the homicide. The residence of Lon Smith, the father-in-law of Coggins, also faced the Senoia and Griffin public road and was about 30 to 50 yards distant from the store, the front porch of which was slightly further back from the road than was the awning in front of the store. The porch of the Lon

·Smith residence was partially screened by vines and rose bushes. The residence of John Wesley Smith, brother-in-law of the deceased, was about 150 yards from the store, and the residence of Charlie Coggins, the deceased, was about 400 yards from the store. The defendant resided with his father about a half mile away. Mrs. Smith and her daughter (the wife of Charlie Coggins) were seated with others on the front porch of the Lon Smith residence when the tragedy occurred, which lasted but a very few minutes. It was on Saturday afternoon, October 22, 1921. About thirty minutes before the difficulty which culminated in the homicide, Grover Ison drove up to the store in his automobile, used profane language, and made other remarks in the presence of John Wesley Smith, Alec Rivers, and others. He then drove off to his father's house and returned. Alec Rivers testified that when defendant was at the store, as above stated, "Grover made the remark that he had to go to Brooks to put some money in the bank, and remarked that a man who would steal a pistol and corn would do anything." The remark was made in the presence of the Smith boys, brothers-in-law of Charlie Coggins. John Wesley Smith testified that when Grover Ison left the store to go to his father's house, he passed by the residence of witness, and when opposite the house discharged his pistol twice. Witness also went to his house where he found Coggins, and they returned to the store "to get a dope," and after they had taken the "dope" they sat down under the awning in front of the store, and were playing checkers with Gus Smith when Grover Ison returned from his father's house. Ison drove up with certain companions in his automobile and stopped within a few feet of the checker players, the car being headed towards Griffin. What then occurred was described by a number of witnesses.

John Wesley Smith, a witness for the State, testified on direct examination: "Grover Ison . . drove . . down to the store and got out of his car cursing. He was calling somebody a son of a bitch. . . He said the son of a bitch had done so and so. Then Charlie Coggins asked him to quit cursing, that his mother was right up there. He cursed again, and said them God damn sons of bitches. Charlie Coggins got up from the checker-board and started in the door of the store. But before he got to the door, Grover Ison overtook him and knocked him around with

his hand and shot him twice. Then, before I got to him, he had killed him. When he fell Ison fell on top of him. In the meantime, Ison was trying to shoot me. I grabbed at the pistol so he could not kill me, and got it out of his hand. He was on Coggins. I hit him twice across the head to make him turn him aloose. I got the gun and got hold of the handle of it, and when I got hold of the handle of the gun brother jerked it. And I then pulled Grover Ison off of Charlie Coggins. After he shot, Ison cranked up his car and went home. . . Mr. Ison seemed to be like he was drinking. He had about as much as a fellow could walk with. I did not see anything in Charlie Coggins's hand just before he was shot. He did not have anything. He had not struck Ison before Ison pulled out his pistol. Ison had pulled out his gun before he left his car. As Ison walked to the store door he was cursing, and as he walked around his car. I did not know who he was speaking to. He did not call any name. . . In reference to the store door, Charlie Coggins was shot at right in the door. He fell right against Mr. Ison. He had not been in the store then. He had stopped inside the door. Mr. Ison was standing in front of his car when Coggins got up from the checker-board. When he shot Coggins he had him up in his arms inside the door. When he got inside the door, he ran and knocked him around inside the door. And hugged him and shot him. Coggins went in first. Coggins was going in, and this man ran in and knocked him around and shot him." On cross-examination the witness reiterated substantially his testimony given on direct examination, and stated further, in answer to a question, that when Charlie Coggins started in the door of the store he did not say to Grover Ison, " I will see you about that, young man."

Gus Smith, a witness for the State, testified on direct examination: " Mr. Ison said God damn son of a bitch. He talked loud enough to be heard one hundred fifty yards. He was on the ground." On cross-examination he testified: " He came to the store from in front of the car. He was cursing, and Coggins only asked him not to talk so loud. He was cursing and saying God damn son of a bitch. Just like boys usually curse. He was not saying God damn son of a bitch to any body in particular. He was talking loud. I don't know that he was angry with anybody. He [deceased] said they would hear him. Ison replied, ' God

damn those sons of bitches, and you too. I will see you about it.'
He then started towards the store. Ison pulled out his gun when
he first started. He did not pull it out as he got out of the car.
. . Ison caught him then by the shoulder and turned him
around. He was going towards him — behind him — following
him, and just caught him by the shoulder. Grover did not go into
the store first. I don't know what Coggins was going to the store
to see about." Other witnesses testified for the State, giving testi-
mony corroborative of what has already been stated, which need
not be repeated.

Gill Foster, one of the persons who came to the store with the
defendant in his automobile, testified as a witness for the de-
fendant: "I got out and went into the store, and Grover Ison
came behind me. When Grover got out of the car Charlie Cog-
gins got up and said 'Grover don't talk so loud.' Grover said,
'I am not talking so loud.' Charlie said, 'Yes, but I know you are.'
Grover said, 'Does the store belong to you?' He said 'No.' Grover
walked up in the door. Charlie got up and come around and went
in on the right-hand side, and picked up a bat and said: 'I am
going to knock your damn brains out.' He hit him, and said:
'I will hit you again,' and hit him twice more, as Grover was
shooting. . . . I did not see Grover Ison that day with any
whisky or other intoxicating drinks. I did not see him drink
anything that day. He was not drunk. . . . Grover Ison
did not use any curse words. Ison pulled his pistol out after he
was hit. As Ison approached the store Mr. Coggins did not go
in ahead of him. They were practically together. When they got
inside the store Ison was right at the door. He was about a foot
and a half inside the room. That bat was just about a foot from
the showcase, leaning up against a window and by or against the
showcase. There were no words spoken between these two men
between the time they entered the store door and the place where
the bat was. When Coggins grabbed the bat he said he was going
to knock his damn brains out, and hit his first lick with a bat.
Grover said, 'Do not hit me any more.' Grover threw his hand
up this way [indicating] and knocked the lick off. He succeeded
in knocking the lick off. The bat hit him on the head. When the
second lick was hit with the bat, that was the time Grover pulled
his pistol out. He did not shoot then — not until he hit the

third lick. He shot 'as he was hitting the third lick. They fell together. Both fell. . . Grover did not say, 'I will kill you, you God damn son of a bitch.' When Coggins got up from the bench where he was playing checkers, he says, 'I will see you about that that you have been talking about.' And then he proceeded in to the store, on the right-hand side of Grover." On his cross-examination the witness testified: "Then I went in the store. Grover walked up in the door. At that time Charlie said, 'Grover, you have to take that out — you talk too loud.' Grover was talking to me. He asked me how long it would be before I would be ready to go. We were standing close together. We were fronting each other. I said that Coggins said that he would have to cut that out, that he was talking too loud. . . Grover had walked up in the door. And Charlie went in to the side of him. I was on the inside of the showcase. The showcase is eight or ten feet from the door. Charlie got the bat from back of the showcase at the window. It usually stayed there. It did not stay six or eight feet from the door. He picked up the bat and came back to where Grover was, and struck him across the head. He made a big heavy blow. Grover said, 'Don't do that — don't hit me any more.' Charlie said, 'I am going to knock your damn brains out.' Charlie tapped him again, and the blood spurted from it. I don't know which side he struck him on the first lick. The blood came because of those licks. The licks made the blood flow. The first or second lick broke the scalp. Then Grover pulled out his pistol. He shot him as the third lick hit him. I was eight or nine feet from Charlie and Grover, at the showcase. I did not say anything to them. I did not ask them not to have any trouble there. Nobody asked them. Ison said the first time, 'Don't do that any more.' Charlie had the bat up this way [indicating]. Charlie said, 'I will knock your damn brains out,' and hit him again. Grover shot him after the second lick. The third lick was passed as he shot. Charlie fell. And Grover fell also. He fell out of the door. Charlie fell on Grover, with his head upon Grover. Charlie fell immediately after Grover shot. They both fell at the same time. Grover was standing pretty close to him when he shot him. He threw up his hand and knocked off the lick. The bat struck him then. It did not bring blood from his arm. That lick hit him on the arm and head too. The bat did

not wound his hand. The bat hit him on the arm and carried it down. When Ison shot Coggins he was very close to him. Ison fell at the same time Coggins did, but he fell backwards out the door. I don't know that J. W. Smith took the pistol away from Ison and struck him over the head. He did not do that. Ison did not fall against the ice-box and bruise his head."

Walter Burdette, another one of the persons arriving in the automobile, testified as a witness for the defendant: " Charlie Coggins asked Grover to respect his home and the place around there. Grover said, ' What have you got to do with it?' Charlie got up and walked in the store and said, ' God damn you, I will see you.' He went in the front room on the right-hand side and got the ball bat which was some six feet in the store. . . He hit Ison with that bat. Grover Ison said, after he had hit him the first lick, ' Do not hit me any more,' because he did not want to hurt him. Charlie said that he was going to knock hell out of him, and he hit him again. He drew back the third time, and Grover got out his pistol, and I went out the door." In his cross-examination he reiterated the same testimony. Other witnesses for the defendant gave testimony corroborative of what has already been stated; and certain physicians testified as to the nature of wounds on the head of the defendant, and, without being able to state that they were not inflicted by the trigger guard of the pistol, they were inclined to believe that they were inflicted by a blow from a round instrument similar to the baseball bat.

The defendant made a statement before the jury, in the course of which he said: " I saw no one on the porch. When I got to the store I noticed some boys playing checkers. I did not pay any attention to it. Mr. Coggins spoke to me, and said, ' You have got to respect me and this place here.' I did not know his wife was at the house there. If I used any curse words, I don't know it, and I don't recollect it. I spoke to him. I had no malice towards him, at that time. I asked him what he had to do with it — that it was not his place of business, but it was a public place. Walter Burdette went in the store. Sansom and Rivers went off. As I was standing there Coggins came to my right side, and the next thing I knew he had a bat — that bat there. I saw he was going to strike me, and I threw up my hand to knock the lick off more times than once. I asked him not to hit me, and not to

strike me again. He came down with it on me and knocked me as blind as a bat. I reached for my gun and shot him twice, quick as I could. He said he was going to knock my damn brains out. I understood his words. He hit me. When he hit me two times and had the bat up to hit me the third time I shot him. . . I hated to shoot any man. I am sorry I took this man's life. I had to do it to save my own life."

*E. R. Clarkson, J. J. Flynt,* and *Cleveland & Goodrich,* for plaintiff in error.

*George M. Napier, attorney-general, E. M. Owen, solicitor-general, Seward M. Smith, assistant attorney-general,* and *W. H. Connor,* contra.

ATKINSON, J. 1. The judge omitted to charge the law of voluntary manslaughter applicable to a case where the homicide occurs as a result of mutual combat between the deceased and the accused, and excluded that theory from consideration of the jury by the language used in charging generally the law of voluntary manslaughter. If there was evidence that the homicide occurred as a result of a mutual combat between the defendant and the deceased, arising upon a sudden quarrel, it would have been the duty of the judge to instruct the jury upon that phase of the case, and erroneous to so instruct the jury as to eliminate that view of the case from the consideration of the jury. *Waller* v. *State,* 100 *Ga.* 320 (28 S. E. 77) ; *Butt* v. *State,* 150 *Ga.* 302 (2) (103 S. E. 466), and cit. The controlling question is whether the evidence was sufficient to show mutual combat between the parties at the time of the homicide. In *Matthews* v. *State,* 136 *Ga.* 125 (70 S. E. 1110), it was said: " The great weight of the evidence introduced by the State, if credible, tended to show that the accused was guilty of murder; the statement of the accused, who introduced no evidence, made to the jury, tended, if worthy of credit, to show that the homicide was justifiable; the jury could have found from some of the evidence for the State, considered in connection with a portion of the statement of the accused to the jury, that the accused and the deceased, while engaged in an angry altercation, both drew weapons, the former a pistol, the latter a knife, and each willing and intending to fight, in hot blood and without malice, endeavored to use his weapon on the other, and that the deceased was killed in such rencounter. It follows, therefore, that the court erred in not

defining the offense of voluntary manslaughter, and in not instruct-
ing the jury as to the law of that grade of homicide applicable to
mutual combat, as presented by a timely written request on the part
of the accused." In *Findley* v. *State,* 125 *Ga.* 579 (54 S. E. 106),
the facts relating to mutual combat were stated as follows: " The
accused went to a house on the place of the deceased and caught his
(the defendant's) son, a boy about fifteen years old, who was there,
by the collar and told him to come on home, and asked him why
he hadn't been home. The deceased told the accused that he had
hired the boy and he did not ' reckon' the latter would go unless
the accused got him by law. The accused said he ' reckoned' he
would, and that the law didn't have anything to do with his son,
that he thought he had a right to carry him. The deceased replied
that the accused would have to go to law before he could get the
boy. He struck the accused with his fist. A person who was present
advised the accused to turn the boy loose. The accused said, ' I
am going on home. I am not going to have any fuss on your side.'
The deceased replied that he had better go, and the accused said,
' I am going.' The deceased struck him again, and he went on.
The deceased acted as if he were going to get a rock from the
ground, but the witness caught hold of him and advised him not
to do it. The accused told the deceased that if he (the deceased)
would come out into the road he (the accused) would kill him.
The deceased asked a person near by to lend him a 'gun, but he did
not get it. The accused said, ' If you come out here in the road I
will kill you.'· A witness who narrated these facts then added,
' And the last word I heard Mr. Bradshaw (the deceased) say was,
' I am not going to'; and about that time the pistol began to shoot.'
When the deceased made this statement ' he had not got to the road.'
In another part of his testimony the witness said that it was
not more than two or three minutes from the time the deceased
struck the accused the second time until the latter commenced
shooting. ' Immediately after Mr. Bradshaw said, ' I am not
coming there,' the shooting began. When the accused made the
statement as to the deceased coming out in the road, the witness
supposed he meant the ' big road,' The deceased did not have to
go out into that road to reach his house. The accused did have
to get into it to reach his house. The witness also thought that
the accused and the deceased were both in the road leading from

the house of the deceased to the public road. The accused shot once, then waited a second, then shot four or five times. He then left. Later in the night he returned to the place where the deceased was lying, but not then dead. A witness heard the deceased say, ' There is no need. of that, Uncle Eli.' The accused answered, ' I thought you were dead. You haven't treated me right.' The deceased was on the edge of the public road when he was killed. At another time the same witness said that the deceased was in the public road when he was killed. He was going towards the defendant's house. In describing the wounds found upon him, the witness said, ' I saw two wounds in the side, one in the stomach, and some kind of scar or shot on the head. His face looked like it was scratched. His forehead looked like he had been struck with something, may be a rock.' On re-direct examination the witness said that when the accused said, ' If you come out in the road, I will kill you,' the deceased said, ' That is all right; you can kill me if you want to;' and the accused went on. When he had gone a short distance he said, ' Don't come out in the road on me. If you do, I will kill you.' The witness added, ' About that time Mr. Bradshaw got about even with my brothers.' " It was held that " Under the facts of this case the court erred in not giving in charge the law of mutual combat, or mutual intent to fight." In the course of the opinion it was said: " The evidence in this case involved the question of whether or not there was such a mutual combat at the time of the homicide as to reduce the killing from murder to manslaughter. The court omitted entirely any reference to that subject, though charging generally on the subject of manslaughter. In *Ray* v. *State*, 15 *Ga.* 223, it was said: ' Our law requires that there should be some assault, by the person killed, upon the person killing; but evidence of such assault may be found in a mutual intention to fight, and in the fact of an approach by the decedent to the prisoner, in furtherance of this design, when it was not necessary for him to do so in self-defense.' Mutual blows are not always necessary to make mutual combat. *Tate* v. *State*, 46 *Ga.* 157; *Gresham* v. *Equitable Ins. Co.*, 87 *Ga.* 497. See also *McMillan* v. *State*, 35 *Ga.* 60; *Trice* v. *State*, 89 *Ga.* 742; *Gann* v. *State*, 30 *Ga.* 67; 7 Michie's Dig. Ga. Rep. 76-77; 2 Roscoe's Cr. Ev. *724."

In *Bailey* v. *State*, 148 *Ga.* 401 (96 S. E. 862), one question

was whether the evidence was sufficient to show mutual combat between the parties at the time of the homicide, and it was held that the evidence was sufficient. The following quotation from the opinion will suffice to show the facts of the case and the decision of the court: " The accused and deceased were standing on the edge of the sidewalk, quarreling. Deceased struck the accused with his fist, and both backed off into the street. While backing, the accused drew from his pocket his knife and opened it with one hand, and cut the deceased, inflicting the mortal wound, and immediately fled. From this evidence there might be found the mutual intention to fight. Such intention upon the part of the deceased would be manifested by quarreling and striking the accused with his fist, and a like intention upon the part of the accused would be manifested by quarreling and deliberately drawing his knife and dealing the deadly stab upon provocation consisting of the blow. The question under the conflicting evidence was for the jury, but the evidence was sufficient to authorize its submission."

In the light of what has been said, how stands the case for decision? The jury would have been authorized to find that there was a fight between the deceased and the accused with deadly weapons, which resulted in the death of the former and the severe wounding of the latter; that the accused in a boisterous manner addressed profane and vulgar epithets to the deceased, within the hearing of the wife and mother-in-law of the deceased and other members of the family; that the deceased ordered the accused to desist from his boisterous conduct, and the latter replied by saying it was a public place, and asking what deceased had to do with it; that the deceased replied that he would show him, and started in the store where a baseball bat was known to be, and was followed by the accused; that deceased seized the baseball bat and the fight ensued, the deceased using the baseball bat and the defendant using his pistol. The evidence was conflicting as to the details of the rencounter, but it is difficult to describe accurately the details of such an occurrence; and the jury is not required to take the evidence from one side or the other, but it is the duty of the jury to consider the evidence as a whole in determining the truth of the case. In the circumstances the jury was authorized to find that there was a mutual combat between the accused and the deceased,

which resulted in the death of the latter; and the trial judge erred in not charging the law of voluntary manslaughter applicable to a homicide committed in the course of mutual combat between the parties.

2. As a new trial will be granted on other grounds, it is unnecessary to deal with the ground of the motion for new trial relating to the alleged newly discovered evidence, or with the general grounds which complain that the evidence was insufficient to support the verdict.

*Judgment reversed. All the Justices concur, except Gilbert and Hines, JJ., dissenting.*