## FENNELL *v.* THE STATE.

1. No ruling will be made on the assignments of error that were expressly abandoned in the brief of the attorney for the plaintiff in error.
2. The question of voluntary manslaughter was not involved. This being so, the charge upon the law of voluntary manslaughter as complained of in the fourth special ground of the motion for new trial, though not entirely accurate and somewhat confused in the language employed, was not cause for a reversal of the judgment refusing a new trial, for the

Assault and Battery, 5 C. J. p. 714, n. 84; p. 716, n. 6.

Criminal Law, 17 C. J. p. 211, n. 12; p. 341, n. 83, 84.

Homicide, 29 C. J. p. 1122, n. 39; p. 1125, n. 75; 30 C. J. p. 310, n. 25; p. 447, n. 60.

reason, as contended, that it "confused the jury on the law of voluntary manslaughter."

3. The evidence was sufficient to support the verdict.

No. 5848. APRIL 12, 1927.

Murder. Before Judge Sheppard. Liberty superior court. December 30, 1926.

Herbert Fennell was charged with the offense of murder in the homicide of Viola Fennell, committed by shooting the victim with a pistol. The evidence showed that the deceased was the wife of the defendant; that the homicide was committed about seven o'clock Sunday morning at the residence of Isaac Williams; that the defendant left the scene and was captured later during the morning while he was endeavoring to escape. Other evidence was to the following effect: Between eleven and twelve o'clock during the night before the homicide the defendant and his wife and one other person drove in an automobile to the home of Arthur Gaulden, to borrow a pistol which the defendant desired to take with him on a trip that he was about to make. The defendant went into the house and obtained the pistol while his wife and the other person remained in the automobile. The conversation of the persons in the automobile was heard from the house, and they were all apparently in good humor. The party left in the automobile. The evidence does not disclose what they did during the night after leaving Gaulden's house. The next morning the defendant drove an automobile to the front of the house of Isaac Williams and stopped; he declined an invitation to come into the house, but upon being requested by a woman to "edge her hair" he consented to do so. The process of "edging" the woman's hair was done with a razor furnished by Williams. About the time the work was completed Viola, the defendant's wife, appeared on the scene and asked defendant, "where was that piece of meat," to which the latter replied, "At home." Viola then told defendant, "Come on, let's go home" and the two walked out of the door quarreling. Williams testified thus as to what then happened [on direct examination]: "He went on out with my razor in his hand, . . and she said to him, 'Damn your soul, you will go home,' and he made after her with the razor and she ran on off; he did not get up to her; and she went around that direction, and I told her, I says, 'Viola, you and Herbert . . don't

have no fuss here; you go on home,' . . and she turned and came on back,. and I says, 'Herbert, give me my razor,' and he gave it to me, . . and she came on back and came between the car and the house, and walked up there and put her hand in the pocket of the car with her face turned toward Herbert, and Herbert's pistol was lying on top of the top, and his hat was lying over it, and the top was let back, and his pistol was laying up there and his hat was laying over it; and Herbert goes right back around there and gets the pistol and says, 'I told you to go home,' and that time the pistol fired; he had his pistol in this position [indicating]; one shot was fired; she wheeled and grabbed her side and said, 'Lord, Uncle Ike, carry me home,' and fell. . . I saw her hand and she did not have anything that I seen; the only thing that she did that I saw, during the entire transaction, was she cursed him, and told him, 'Damn your soul, you will go home.'" (On cross-examination.) "I did not hear her make a threat in the house before they came out; she did not make a threat. The automobile was right in front of the door, just a path between the car and the steps; just as soon as they got out of the door she commenced cursing him; he did not do anything, and did not appear to have been mad with her, and when he told her to go ahead home and he and Uncle Ike would come on, he appeared to be perfectly friendly until she cursed him, and then he flew into a rage and got awful mad, and when she cursed him he made at her with the razor; when they walked out on ground she cursed him; when she cursed him he made at her with razor, and she ran towards Mr. Bagley's; and when I told him to give me the razor he gave it to me. I do not know what kept him from cutting her with the razor; he just did not cut her, or at her; he just made at her with the razor; he just took behind her and she got out of the way; when he come out of the house the razor was shut up, and when she cursed him he come up with it open and made at her; he made at her just that way; he never did cut at her; he was never close enough to hit her; . . the woman was down there towards Mr. Bagley's house, and I was talking to them both. I says, 'Viola, you and Herbert, don't you all have any fuss here. . . Viola, you go home.' Then he got the pistol; she did not curse him no more; he got the pistol and shot after she put her hand in the pocket of the automobile door. I do

not know what she was looking for; he had told her that the meat was at home; when she puts her hand in the pocket of the car, he goes around there and gets the pistol, and come on back and says to her, 'I told you to go on home,' and shot; that time the pistol fired."

Trudy Williams, the wife of Isaac Williams, testified that she was in the kitchen of the house and could see the parties at the time of the tragedy. Her testimony corroborated that of Isaac Williams, except as to that part in which Williams testified that defendant pursued his wife with the razor. Other witnesses testified, but these were the only witnesses in the immediate presence who could hear and see all that was said and done. In his statement before the jury the defendant said: "After I got done cutting her hair and sitting down cleaning the razor, my wife walked up in front of the door and says, 'Herbert, where's the meat?' I told her to the house; she says, 'Well, damn it, come on, let's go,' and I says, 'You ought not to curse like that; go ahead. Uncle Ike [Isaac Williams] is coming with me when he gets through eating breakfast,' and she walked back to the door, and I got up when I seen she seemed to be mad, had the razor in my hand, and when I got to the door I handed the razor to Uncle Ike; he was sitting down side the door; and she says, 'I bet, —— damn you, you will go, you black son of a ——,' and I says, 'No use doing that right here, Mr. Bagley's children around here and the children around,' and she kept cursing me, and I walked towards her and she ran off towards Mr. Bagley's house, and I turned around and come back to the car, and she come back up there and was cursing me right on, and I picked up the pistol off the top, I had the top leaning back and the pistol laying up there, and I picked up the pistol and shot her. . . Sure I was mad after she cursed me for a son of a ——; but it wasn't my intention to kill her when I shot the pistol."

The jury returned a verdict of guilty, without recommendation. The defendant made a motion for new trial on the usual general grounds, and upon four special grounds which were set forth in an amendment to the motion for a new trial. A new trial being refused, the defendant excepted. The first three special grounds of the amendment to the motion for new trial were expressly abandoned in the brief of the attorney for the plaintiff in error.

The fourth was as follows: "That the court erred in his charge to the jury, to wit: 'Now, in connection with the law of voluntary manslaughter, I give you this law: Provocation by words, threats, menaces, or contemptuous [gestures] shall in no case be sufficient to free the person killing from the guilt and crime of murder. In other words, provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder; that is to say, to reduce it from murder to manslaughter; that is, words, threats, menaces, and contemptuous gestures wouldn't of itself be sufficient to reduce an unlawful killing from murder to manslaughter. The killing must be the result of that sudden, violent impulse of passion, supposed to be irresistible; and if that be true, then the mere fact that he may have started the difficulty wouldn't make any difference, if the killing was done under circumstances which aroused within the mind of the person killing such a passion as was irresistible upon his part, or upon her part, as the case may be. When I said his I just meant in a general sense; for if there should have been an interval between the assault or provocation given and the homicide, of which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge and punished for murder.' The error in said charge being that the same confused the jury on the law of voluntary manslaughter."

*O. C. Darsey,* for plaintiff in error.

*George M. Napier, attorney-general, J. Saxton Daniel, solicitor-general, J. T. Grice, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

ATKINSON, J. 1, 3. The rulings announced in the first and third headnotes do not require elaboration.

2. In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied. Penal Code (1910), § 65. An assault is an attempt to commit a violent injury on the person of another. Penal Code (1910), § 95. Mere preparation to commit a violent injury upon the person of another, unaccompanied by a physical effort

to do so, will not amount to an assault. *Brown* v. *State,* 95 *Ga.* 481 (20 S. E. 495); *Williams* v. *State,* 99 *Ga.* 203 (25 S. E. 681); *Penny* v. *State,* 114 *Ga.* 77 (39 S. E. 871); *Groves* v. *State,* 116 *Ga.* 516 (42 S. E. 755, 59 L. R. A. 598); *Shubert* v. *State,* 127 *Ga.* 42 (55 S. E. 1045). An assault may be found in a mutual combat where both parties intend to engage in the fight. *Ison* v. *State,* 154 *Ga.* 408 (114 S. E. 351); *Slocumb* v. *State,* 157 *Ga.* 131 (121 S. E. 116); *Boatwright* v. *State,* 162 *Ga.* 378 (134 S. E. 91). On careful examination, the evidence in this case, considered in connection with the prisoner's statement, fails to show a direct assault upon the defendant by the person killed, or mutual combat between the parties from which an assault might be found, or any attempt on the part of the person slain to commit a serious personal injury upon the defendant, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied. In the circumstances the question of voluntary manslaughter was not involved. This being so, the charge upon the law of voluntary manslaughter as complained of in the fourth ground of the motion for new trial, though not entirely accurate and somewhat confused in the language employed, was not cause for a reversal of the judgment refusing a new trial, for the reason, as contended, that it "confused the jury on the law of voluntary manslaughter."

*Judgment affirmed. All the Justices concur.*