## BUCHANAN, *alias* BAILEY, *v.* THE STATE.

1. Where the law of mutual combat is essentially for consideration in the case, the charge of the court should submit it to the jury, though no written request therefor is preferred; and the failure to charge this law where it is involved under the evidence is error requiring the grant of a new trial.

2. If the law that a person shall not be found guilty of any crime or misdemeanor committed by misfortune or accident was pertinent in this case, it was because of the defendant's statement. No request in writing was made to charge that law; and the court was not bound to give instructions based on a theory contained only in the defendant's statement, in the absence of a written request.

3. The failure upon the part of the court to charge section 73 of the Penal Code, which declares, that, " If a person kill another in his defense, it must appear that the danger was so urgent and pressing at the time. of the killing, that, in order to save his own life, the killing of the other was absolutely necessary; and it must appear, also, that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given," was not hurtful to the accused. While this section is applicable in cases of mutual combat, it was clearly not hurtful to the defendant to omit giving it as a part of the instructions in this case.

No. 3170.   JULY 15, 1922.

Indictment for murder. Before Judge Wright. Floyd superior court. March 11, 1922.

*Harris & Ennis* and *Porter & Mebane,* for plaintiff in error.

*George M. Napier, attorney-general, E. S. Taylor, solicitor-general, Seward M. Smith, asst. atty.-gen.,* and *J. F. Kelly,* contra.

BECK, P. J. Sam Buchanan, alias Son Bailey, was tried upon an indictment charging him with the murder of Charlie Walker. The jury trying the case returned a verdict of guilty, without a recommendation; and the accused was sentenced to be hanged. He made a motion for a new trial, which was overruled, and he excepted.

1. In one ground of the motion for new trial error is assigned upon the failure of the court to instruct the jury on the law of voluntary manslaughter. as based upon the theory of mutual com-

bat or mutual intent to fight; the movant contending that under the facts and evidence a charge upon that subject was required. The court charged on the subject of voluntary manslaughter, but did not charge on the subject of mutual combat or mutual intent to fight. We are of the opinion that the failure to charge upon this subject was error. Several eye-witnesses testified in this case, among them one Bell Cates. A part of her testimony was as follows: "I know Son Bailey, and knew Charlie Walker in his lifetime. I saw Charlie Walker the night of the 11th of March, when he got killed. I had been knowing him about twelve months. We were good friends. I went to the Hall that night and I went home with Son Bailey's sister to spend the night. She lived on River Avenue in East Rome. Charlie Walker came in there after me, and I told him I was not going home, and he commenced to curse out there at that woman's house, and came in and slapped me and wanted to kick me, and drew a pistol on Son Bailey standing in the door. This was over in East Rome, and about 11 o'clock at night. Charlie Walker followed me from the hall on over to Son Bailey's sister's house. I had gone to bed. Charlie Walker knocked on the door, and they asked who it was, and he said it was Charlie, and they opened the door for him to come in, and he would not do it but stood on the steps and cursed. He was cursing all of us. When Charlie came in the house, Son Bailey and his mother and sister and myself were in there. We had gone to bed. Son Bailey's sister had gone to bed, and his mother too; and Son was fixing to go to bed. Charlie came in and pulled me out of the bed and jumped on me, and beat me and cuffed me around there; and Son told him to get out of his mother's house, and he commenced cursing Son and drew a pistol on Son, and said he was going to kill him if he came out of doors. Son put on his shoes, and Charlie pulled me out of the house and drug me on and came across the East Rome bridge, he pulled me on with him. We met Son on Eighth Avenue. We came from East Rome over Fourth Avenue. When we met Son he had been up to North Rome to look for his little dog, his mother's little dog. When we met, Charlie commenced cursing Son from across the street, and Son came over there, and Charlie had his knife open, and he was walking up on Son cursing him — told him he was going to kill him; and Son says, 'Leave me alone; I aint going to bother you;'

and Charlie kept walking on him, and Son shot him in the leg; and Charlie kept coming on him with the knife, and he shot him in the stomach. That's the way it was; and Son shot him in the breast there, and they scuffled around there, and I don't know what became of the knife, but Charlie got the pistol out of Son's hands, and Son ran."

W. C. Bowan, another eye-witness to the killing, testified: " I am a street-car conductor and motorman, and was on the 11th day of March, 1921. I remember the occasion when Charlie Walker was shot on upper Broad Street, in the City of Rome. That was about 11:20 at night. I was at Eighth Avenue, on the west side of Broad Street, going up. I was about Eighth Avenue. It started right at the corner of the sidewalk about Eighth Avenue. . . I saw the difficulty. As I came down I noticed three negroes: a negro boy and a negro girl, and then Son Bailey, this defendant, coming down behind them. They were going towards town, coming down the street all of them. Of course, I did not pay any attention to them as I got in there; and as I stepped out of the car to throw my switch to go in and turned my trolley, I heard somebody holler, and I looked around, and it was this negro girl, and Son Bailey had drawed his gun, and just about the time I looked around Walker was going on him, his hand like this [witness indicating], trying to catch the gun or hit him, going on him with his hands up something like this [indicating], and Bailey shot; and about that time Walker got the gun, and they kept scuffling over the gun down about even with their breasts, and they kept scuffling until the third shot was fired, and both still had hold of it, but it was lower down." And witness Slaughter McCain testified: " I saw this difficulty as I was going along home that night. I saw what happened right then and there. I was going home between 11 and 12 o'clock, and walking along smoking, and I got up beyond where Mr. Printup lives, the old Featherston place on the corner of Eighth Avenue and Broad, and just before I got to the small mail-box I saw two men all hugged up with their arms around each other's necks. I did not know they were fighting; couldn't hear them say a word, and both had their heads down that way [indicating], clinched, and I still kept walking, and I was in about ten feet of them."

The testimony of the witness Bell Cates, narrating the circum-

stances immediately. preceding the homicide, was in effect, that, while she and the deceased were together, the accused, Son Bailey, was seen across the street, and the decedent commenced cursing the accused; the accused then came across the street to or near where the witness and the decedent were, and 'the latter, with an open knife in his hand, proceeded to walk up to the accused, cursing him as he approached, threatening to kill him, and that the decedent kept on walking up to the accused, although the latter said to him, " Leave me alone; I am not going to bother you," and that then the accused shot him. This evidence might authorize the jury to find, under proper instructions of the court, that the defendant, acting under the fears of a reasonable man that his life was in danger or that a felony was about to be perpetrated upon him, shot in self-defense. But when we consider the evidence as to what transpired at the house of Son Bailey's sister earlier in the night, when the decedent attacked the woman, Bell Cates, and that Son Bailey when near the place of the homicide was seen and met by the decedent and the woman; that he was armed with a pistol; that when he was cursed by the decedent he crossed over the street to the side on which the decedent and the woman were standing, and that then he was approached by the decedent with an open knife, cursing as he approached,— the jury would have been authorized to find that there was a mutual intention to fight. Though, according to the witness who narrated these facts, the defendant said, " I am not going to bother you," it was for the jury to decide with what intention the accused crossed the street, armed as he was, and approached the man who was cursing him, and with whom he had had an altercation earlier in the evening. They could have inferred a mutual intention to fight; and there is evidence tending to show that they did fight. With these facts and evidence it was for the jury to say, under proper instructions on the subject of voluntary manslaughter based on the theory of mutual combat, whether or not there was actually a mutual combat or mutual intent to fight, and whether or not the accused was guilty of voluntary manslaughter because of the commission of the homicide under those circumstances. Voluntary manslaughter as based on mutual intention to fight being involved in the case, under the facts set forth above, a failure to charge upon that subject was error. In the case of *Waller* v. *State,* 100 *Ga.* 320 (28 S. E. 77), this court

said: "There being, on the trial of an indictment for murder, evidence which, if credible, would have warranted a finding that the slayer and the deceased, upon a sudden quarrel, each being armed with a deadly weapon, mutually engaged in a mortal combat, each using his weapon and intending to kill the other therewith, it was the duty of the judge, with or without a request, to give in charge to the jury the law of voluntary manslaughter as related to the doctrine of 'mutual combat,' and the omission to do so is cause for new trial, where the accused was convicted of murder." In *Findley* v. *State,* 125 *Ga.* 579 (54 S. E. 106), it was said: "The evidence in this case involved the question of whether or not there was such a mutual combat the time of the homicide as to reduce the killing from murder to manslaughter. The court omitted entirely any reference to that subject, though charging generally on the subject of manslaughter. In *Ray* v. *State,* 15 *Ga.* 223, it was said: 'Our law requires that there should be some assault, by the person killed, upon the person killing; but evidence of such assault may be found in a mutual intention to fight, and in the fact of an approach by the decedent to the prisoner, in furtherance of this design, when it was not necessary for him to do so in self-defense.' Mutual blows are not always necessary to make mutual combat. *Tate* v. *State,* 46 *Ga.* 148, 157; *Gresham* v. *Equitable Ins. Co.,* 87 *Ga.* 497. See also *McMillan* v. *State,* 35 *Ga.* 60; *Trice* v. *State,* 89 *Ga.* 742; *Gann* v. *State,* 30 *Ga.* 67; 7 Michie's Dig. Ga. Rep. 76-77; 2 Roscoe's Cr. Ev. \*724. Where the law of mutual combat is essentially for consideration in the case, the charge should submit it to the jury. *Waller* v. *State,* 100 *Ga.* 320." The doctrine here stated has been applied in later cases.

2-3. The rulings made in headnotes 2 and 3 require no elaboration.          *Judgment reversed. All the Justices concur.*