*M. B. Eubanks,* for plaintiff.

*Porter & Mebane,* for defendant.

---

## DANIELS *v.* THE STATE.

HINES, J. 1. The defendant was indicted for the murder of Ida Daniels. The proof showed that the real name of the deceased was Ida Daniels, but that she was generally known by the nickname of Sister. *Held,* that this was sufficient proof of the allegation of the indictment that the person killed was Ida Daniels, it being permissible to designate in the indictment the person killed by her proper name, if known, or by some name by which she was commonly and generally known. When the deceased is referred to in the indictment by her proper name, proof of such name is sufficient, although the evidence discloses that the deceased was commonly and generally known by another name. *Irwin* v. *State,* 117 *Ga.* 722 (45 S. E. 59).

2. The evidence authorized a verdict of guilty of murder.

3. The court charged the jury as follows: "You look to all the evidence and facts and circumstances in this case, and, after considering the defendant's statement, determine whether the defendant is innocent in this case." The exception to this charge is, that it is not the province of the jury to determine whether the defendant is innocent, but to determine whether the State has carried the burden of showing the guilt of the defendant beyond a reasonable doubt. The judge fully instructed the jury upon the presumption of the defendant's innocence, and stated that the burden rested upon the State to establish his guilt beyond a reasonable doubt, and that if such doubt existed in their minds they should give him the benefit of such doubt and acquit him. *Held,* that this instruction, in view of the court's instructions upon the presumption of the innocence of the defendant, and upon the burden resting upon the State to prove his guilt beyond a reasonable doubt, and of the further instruction of the judge to the jury, that, if such a doubt existed in their minds, they should give the defendant the benefit thereof and acquit him, was not so erroneous, if error at all, as to require the grant of a new trial. Innocence and guilt are involved in every criminal case. In the eye of the law innocence is presumed, and always exists if the State fails to rebut the presumption of its existence and to prove guilt beyond a reasonable doubt. Clearly the jury had the right to determine whether the defendant was innocent; and this instruction, laying down the method of reaching a conclusion on this matter, was not erroneous, as the issue was one of guilt or innocence. This instruction was not open to the objection that it required the defendant to prove his innocence beyond a reasonable doubt. In *Dorsey* v. *State,* 110 *Ga.* 331 (35 S. E. 651), the charge was such that the jury might have been impressed with the idea that the defendant had to establish his defense beyond a reasonable doubt.

4. The defendant excepts to this charge of the trial judge: "I charge you,

gentlemen, that if two parties intentionally agree to have a fight and to engage in mutual combat with deadly weapons and in such fight or mutual combat one kills the other, the person so killing would be guilty under the law of the crime of murder or voluntary manslaughter." The above excerpt is only a part of the legal principle embraced in one paragraph of the charge; and while if standing alone it might seem to be objectionable for reasons which might be assigned, when taken as a whole it is unobjectionable. The error in this excerpt assigned by the defendant is that this instruction was not authorized by the evidence. There were in evidence some facts and circumstances tending to show that the defendant and one Will Clark harbored bad feelings toward each other growing out of their illicit relations with the deceased, and that, meeting in the presence of the deceased, and both being armed with pistols, after some words had passed between the defendant and the deceased they drew their weapons and began to shoot at each other, when the deceased was killed by shots fired by the defendant. Thus it became necessary to determine whether the defendant would have been justified if he had killed Clark, and, if not justified, whether he would have been guilty of murder or manslaughter if he had succeeded in killing Clark; in order to determine whether he was justified in killing the deceased, and, if not justified, whether he was guilty of murder or manslaughter in killing the deceased. Under these facts and circumstances, the exception to this instruction is without merit. Being suddenly aroused by anger, and mutually intending to fight, the law of mutual combat was involved. *Gann* v. *State*, 30 *Ga.* 67; *Caruthes* v. *State*, 95 *Ga.* 343 (22 S. E. 837); *Findley* v. *State*, 125 *Ga.* 579 (54 S. E. 106); *Giles* v. *State*, 126 *Ga.* 549 (55 S. E. 405); *Buchanan* v. *State*, 153 *Ga.* 866 (113 S. E. 87). Mutual combat sufficiently appears where it is shown that there was a mutual intent by the accused and the deceased to fight and one or more shots were fired. *Bailey* v. *State*, 148 *Ga.* 401 (96 S. E. 862).

5. The court gave in charge to the jury the principle of law on mutual combat embraced in section 73 of the Penal Code. The exception to this charge is, that, under the evidence, the case was one of murder or justifiable homicide, and for this reason this instruction was without evidence to support it, and tended to confuse the jury. *Held*, that there was some evidence to support this instruction, under the theory dealt with in the preceding headnote.

6. The court charged the jury as follows: "The defendant in this case contends that Will Clark was shooting at him, and that in order to save his own life, or to prevent a felony being committed upon him, that he shot the said Will Clark in defense of his own life, and that he did not shoot the deceased and had no intention of killing her." This charge is excepted to, (*a*) because the defendant did not contend that he shot at Clark and not at the deceased, (*b*) because this charge amounted to an instruction that the jury should not believe the defendant's statement, and (*c*) because it amounted to an expression of opinion by the court that the defendant's statement was untrue. *Held*, that these exceptions are without merit. That this instruction stated one of the contentions of the defendant is conclusively shown by his exceptions to another in-

struction of the court to the jury, which will be dealt with in the following headnote.

7. The court charged the jury as follows: "The defendant in this case contends that he is not guilty. He contends that Will Clark was shooting at him, and that in order to save his own life and to prevent a felony being committed upon him that he shot the said Will Clark in defense of his own life, and did not shoot the deceased and had no intention of killing her. Gentlemen of the jury, you look to all the evidence, facts and circumstances of the case, and after considering the defendant's statement determine whether or not the contentions are true." The errors assigned on this charge are: (a) the failure of the court "to charge the jury that if the jury found that Will Clark was shooting at the defendant, and that, in order to save his own life or to prevent a felony from being committed upon him, he shot at Will Clark, and that in so doing he killed the deceased, . . the jury would be authorized to acquit him;" and (b) the failure of the court to charge section 76 of the Penal Code. On this subject the court charged the jury as follows: "If you find that Will Daniels, the defendant in this case, shot at Will Clark and killed Ida Daniels, the deceased, the killing of Will Clark, if he had killed him, would have been justifiable, then the killing of Ida Daniels would be justifiable. If the defendant shot at Will Clark and killed Ida Daniels, and the killing would have been voluntary manslaughter had he killed the said Will Clark, then the killing of Ida Daniels would be voluntary manslaughter. If the defendant shot at Will Clark under such circumstances that the offense would have been murder had he killed him, then the killing of Ida Daniels, the deceased, would be murder if the defendant killed her." Held: (1) That, in view of the instruction of the court to the jury last quoted, the first exception to the charge complained of is without merit. (2) That the excepion to the charge complained of, that the court did not charge section 76 of the Penal Code, is without merit. Failure to give another appropriate instruction in connection with the instruction excepted to does not render the latter erroneous. Hays v. State, 114 Ga. 25 (4) (40 S. E. 13); Bertha Mineral Co. v. Simpson, 154 Ga. 672 (2) (115 S. E. 75).

Judgment affirmed. All the Justices concur.

Gilbert, J., concurring specially. The excerpt from the charge dealt with in the third headnote is technically subject to the criticism made, but, in view of the charge in its entirety, is not cause for the grant of a new trial.

No. 3993. March 12, 1924.

Murder. Before Judge Summerall. Ware superior court. September 10, 1923.

Will Daniels was indicted for the murder of Ida Daniels by shooting on April 15, 1916, and was tried and convicted on May 16, 1923. The evidence was substantially as follows:

Mahalia Brown, for the State, testified: I knew Ida Daniels, but not by that name. Knew her by the name of Sister. Was

present the day that she and Will Daniels had some trouble. She came in the club-room. A crowd of people was there. The first thing that attracted my attention before the shooting was Sister said: "Who wants to play some loose duce?" She was standing behind Will Clark with her hand on him. When she said that, the defendant said: "Me, God damn it;" and he then commenced shooting Sister, and she fell. She didn't have anything. She had done nothing to the defendant to cause him to shoot her, that I know of. She was talking to Will Clark when she said: "Who wants to play loose duce?" Didn't see Will just before that happened. She died time he shot her. She fell right over, and he walked out and ran. Clark commenced shooting at him, and he commenced shooting at Clark. Clark was on the railroad when he fired the first shot. He had already left the house. The killing occurred in 1916, in Ware County. Examined body of deceased after she fell, and she had no weapon of any kind. The defendant and Will Clark had no trouble in there before shooting took place. If it had occurred, I reckon I could have seen it. Defendant and Will Clark were not shooting at each other in the house. After Ida was killed and he walked out, they commenced shooting at each other.

Nancy Roberts, for the State, testified: Ida Daniels was my daughter. We called her Sister. She is dead. They say this man Will Daniels killed her. She was not his wife.

Pearl McCoy, for the State, testified: Was present the day Will Daniels shot Ida Daniels. Was standing on the outside of the door when the pistol fired. Shortly afterwards saw Will Daniels come out of the door. We went over there, and the deceased was afire. We put it out, and she said: "Lord, Will, you have killed me." Will Daniels went on down the railroad, and he and the other fellow were shooting at each other.. The first shooting I saw them do was about a hundred yards from the house. Didn't see the shooting in the house, but heard it. The only word that the deceased said was: "Lord, Will, you have killed me." She just gasped and died. She was hit three times. Didn't examine her body while she was on the floor. She had no weapons. Was not in the house when the difficulty started. Don't know who shot first. Heard three or four shots. Just as soon as the shooting occurred

Will Daniels ran out of the front door, and Will Clark after him. They were down the railroad shooting at each other.

Emanuel McMahoney, for the State, testified: I know Will Daniels and knew him in 1916. The day Ida Daniels was killed I was sitting on the railroad, and Will Daniels came by me, and he went on to the house. I went up there. Just about the time he got to the door I was about ten feet behind him, and I heard some one in the house say: "Who wants to play loose duce?" and he said: "I will play some loose duces." I stopped and I heard a pistol fire. Couldn't tell who fired that pistol. The defendant was standing right in the door when I saw him reach back. Heard a pistol fire two, three, or four times, and they ran and stopped the fire. Saw him running around the side of the railroad, and Clark ran out and commenced shooting at him. He shot one time back at Clark, and ran down into the swamp. Could not tell you where Will Clark is now; he went off. Clark stayed around there about six months. They called "loose duce" a game. As near as I can tell, about three shots were fired in the house. Don't know how the difficulty started in the house. The only thing I know is Will Daniels ran out as soon as the shooting was over, with Will Clark right after him with a pistol in his hand; and Will Clark commenced shooting at him in the back. Will Clark was in the house when I walked up. The defendant was standing in the door, and I looked across his shoulder and saw Will Clark standing at the back of the wall about ten feet from the door. Could not see whether Will Clark had a pistol or not.

Estelle Kinlaw, for the defendant, testified: At the time Sister was killed I was living right in front of the club-house just across the railroad. There was a good many darkies around the club-house. Did not hear any of the difficulty before the shooting began. Heard the shooting. Several shots were fired in the house. Several different sounds of them. Don't know which fired first. After the shots were fired Will backed out of the door. Will Clark was shooting after him. Will Daniels shot back two or three times. The shots were about as rapid as a person could fire. They had different sounds—some louder than others.

Robert Craig, for the defendant, testified: In ,1916 when a woman called Sister was killed, I was working for the Hebard

Cypress Company. Never directly saw the shooting, only the way Will came out and got his gun and the shooting began in there, and Will Clark with his gun getting something out of his pocket. This woman said something about playing loose duce. She was sitting down beside Will Clark. The woman jumped up and said: "What son of a bitch is here wants to play loose duces?" and walked back on Will Clark, who went to getting up. Will Daniels was back to the wall where I could not see him. Will walked up between the door and where this nigger was standing, and she raised up and got back of this nigger and walked around, and Will says: "I will play loose duces with you." Never heard Will Clark open his mouth. When they came out he came out with his pistol. While the woman was back of him and the argument was taking place, he raised up this way and was getting something out of his pocket, and that throwed him where I could not see what he was getting. Don't know who fired the first shot. Several were fired, and Will Daniels ran out of the house. He backed out of the door and went on down towards the nigger woman named Chaney and turned out there. Will Clark followed him down there. He came out of the house with a .44 Smith & Wesson 6-inch barrel in his hand. He shot. Don't know who fired the first shot in the house. Knew this woman called Sister. Will Daniels kept her as his wife and stayed with her some, and this other nigger did the same way. Could not tell how the difficulty started in the house. Will Daniels is a pretty good nigger. Never heard of his being anything else. He worked every day. Saw Will Daniels when he left the place going to the pond, and never saw him until they brought him into the court-room the other day. Don't know anything about his getting shot in the room in that affray. They were playing skin on the skin-table. Heard a woman say: "Who wants to play loose duce with me?" Right then I saw Will Daniels get his pistol out of his pocket. That was the first thing I saw. When the woman said that, Will went to getting his pistol out of his pocket and said: "I'll play loose duces with you;" and the shooting began. When I saw Will Clark getting up and it looked like he was getting something out of his pocket, that was before Will Daniels had drawn his pistol.

The defendant made a statement to the jury. He said Clark used

to go with this woman. So he and Clark had a run-in concerning her, and he told Clark and her that he would never go with her any more, just to keep down confusion, as he had a wife and two children. He and she had been quit about a month and a half when Clark was going on with her. She asked him, one day when he came to town, would he continue going with her and get Mr. White to let her come out there and stay during that time. He told her no, and she got sore with him. He gave this account of the killing: "And during that time Sister got up from the side of Clark and Walker behind him, and asked: 'What son of a bitch wants to play some loose duce?' She said nobody would play loose duce but a son of a bitch. Well, I didn't say anything then; so Clark he raise up and said: 'I told you about talking with Will last night.' He says: 'I seen you talking with him last night.' And at that time Clark rose and got his pistol. Well, I, I was setting here behind this table, so I sides around from the table this way [indicating] until I got facing the door, and I said: 'I will play loose duce with you all,' just so; and at that time Clark commenced shooting, and he made four shots, and he struck me in that arm [indicating]. And I got that cout [pistol?] out; he made four shots and in the four shots he hit me right there [indicating] with one of the shots, and I made three shots after him, and I backed out of the door and whirled to run, and he continued running there to the door and made two or three shots just before I turned the corner of the house, and then I whirled at the corner of the house and made two shots, and I seen him reloading his pistol, and I made it down to the bay, and he got his pistol reloaded and he whirled around the corner of the house and commenced shooting at me again, and I made it to the bay."

D. A. Woodard, in rebuttal by the State, testified: Went to New Orleans after the defendant with Sheriff Sweat. We found him in jail in New Orleans. The officers told him that we were there for him, and he said he was not the man, that he was the wrong man; and the officers kept talking with him, and told him we had a requisition for him and would have to go to the capitol to get the requisition signed, and it would save us trouble and him too, and he would have to come anyway, and he just as well come on without putting us to that trouble. He come with us. He made a

statement on the train. He told us about how the killing took place. He said he went into the jook there, and this woman asked: "Who wants to play some kind of duce there," and he said he would play duce with her. He said she grappled at the fellow's pocket that was sitting side of her and looked like was going to get a gun, and he shot her. The defendant was pretty clever and talked all the way. He didn't give us any trouble. He is a hard-working negro. He didn't tell me anything about Clark shooting at him. I believe he did say, too, that he ran off down the swamp and somebody shot at him. He said he went to New Orleans and sent for his wife, and she died last October. He went over in Florida.

The defendant moved for a new trial on the general grounds, and amended his motion setting up certain special grounds. The court overruled the motion, and error was assigned.

*John W. Bennett, E. K. Bennett,* and *W. C. Parker,* for plaintiff in error.

*George M. Napier, attorney-general, A. B. Spence, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.