## BOATWRIGHT v. THE STATE.

HINES, J. 1. The court gave in charge to the jury the principle of law relating to mutual combat, embraced in the Penal Code, § 73. To this instruction the defendant excepted upon the grounds: (a) that under the evidence mutual combat was not involved, and (b) because the court did not draw the distinction between sections 59 and 73 of the Penal Code, and direct the jury as to the application of the same. *Held:*

(a) The evidence introduced by the State, if credible, tended to show that the accused was guilty of murder. The statement of the accused to the jury, and the evidence introduced by him, tended, if worthy of credit, to show that the homicide was justifiable. There was some evidence from which the jury might draw the conclusion that the accused and the deceased both drew weapons, the former a pistol and the latter a knife, each being willing and intending to fight, and that the deceased was killed in such rencounter. In these circumstances the court did not err in giving in charge to the jury the principle embraced in section 73 of the Penal Code. *Matthews* v. *State*, 136 *Ga.* 125 (70 S. E. 1110); *Bailey* v. *State*, 148 *Ga.* 401 (96 S. E. 862); *Daniels* v. *State*, 157 *Ga.* 780 (4) (122 S. E. 222).

(b) The other exception to this charge is without merit.

2. The court charged the jury as follows: "Just here I read you this: 'If you should find and believe from the evidence that Barney Lunceford, the deceased, had a drawn knife, and it was a weapon likely to produce death, and the deceased was endeavoring to cut the defendant, and you find that the defendant caught and held the cutting hand and arm of Barney Lunceford and prevented Lunceford from cutting him, the law would not require the defendant to continue to hold the hand and arm to prevent Barney Lunceford from cutting and committing a felony on the person of the defendant.' And I also charge you in that connection that if you believe that the defendant shot and killed Barney Lunceford under such circumstances as that, that it must appear that the danger was so urgent and pressing at the time of the killing, that in order to save his own life the killing of the other was absolutely necessary, and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline further struggle before the mortal blow was given." The principle embraced in the first sentence of said instruction was embraced in a written request preferred by counsel for the defendant. After reading this request, the court added the principle embraced in the second sentence of the above instruction. To the latter portion of the above instruction the defendant excepted on the grounds: (a) that there was no evidence to authorize that portion of said instruction; and (b) because said portion of said instruction was improper and a wrongful qualification of the doctrine of self-defense and of reasonable fears, as laid down in sections 70 and 71 of the Penal Code, upon which the defendant relied as a justification of the homicide with which he was charged. *Held:*

(a) Under the ruling made in the preceding headnote, the first assignment of error on said portion of said instruction is without merit.

(b) Where the law of justifiable homicide to prevent the commission of a

felony upon the person of the slayer, as embraced in sections 70 and 71 of the Penal Code, is involved, it is error to limit the defense to justifiable homicide in a case of mutual combat as embraced in section 73 of the Penal Code. Where the law of justifiable homicide in cases of mutual combat is involved, the court should instruct the jury that the provisions of section 73 are applicable only in the event the jury find that the accused and the deceased were engaged in mutual combat. *Powell* v. *State*, 101 *Ga.* 9 (6) (29 S. E. 309, 65 Am. St. R. 277); *Teasley* v. *State*, 104 *Ga.* 738 (30 S. E. 938); *Pugh* v. *State*, 114 *Ga.* 16 (39 S. E. 875); *Little* v. *State*, 150 *Ga.* 728 (105 S. E. 359).

3. The assignments of error embraced in the other grounds of the motion for new trial are without merit.

4. We grant a new trial in this case because the court erred in limiting the law of justification, as embraced in sections 70 and 71 of the Penal Code, by the law of justification laid down in section 73, and in confusing the law of justifiable homicide laid down in the two former sections with the law of justifiable homicide as embraced in the latter section.

*Judgment reversed. All the Justices concur, Russell, C. J., specially.*

No. 5349. JUNE 21, 1926.

Murder. Before Judge Perryman. Wilkes superior court. February 26, 1926.

Robert Boatwright was indicted for the murder of Barney E. Lunceford. The homicide occurred on August 29, 1925. He was convicted, with a recommendation to mercy. He excepted to the refusal of a new trial. The State introduced the alleged written and oral dying declarations of the deceased. These statements were in substance as follows: The defendant, the deceased, and Allene Lunceford, a sister of the deceased, were at a party at Joe Lunceford's. The people at this party had been promenading. They then began to play games. The deceased noticed that his sister was not among those playing games. He heard some one talking in an automobile at the edge of the yard. He walked out to the automobile. His sister and the defendant were sitting on the back seat of the car. As he walked up to the right side of the car he stepped upon the running-board. He said to his sister, "Allene, why don't you come in and join the game with us. It doesn't look nice for you all to be sitting out here, just you two, and all the others playing games." The accused said something which he did not remember. The deceased then said to the defendant: "Allene is coming in; you can do as you please. Allene can't sit out here with you. Allene, get out of the car and come to the house." She made a move to get out, and he went to take

his head out from under the top and step back off the running-board. About that time he saw the defendant run his hand in his inside coat pocket. The defendant jerked out a pistol and he threw up his hand. As he did this, the defendant fired the first shot, hitting his hand. He kept firing. He thought the defendant shot three of four times. The defendant was right on him. Then he just turned and walked about eight or ten steps and told them he was shot. He had a knife in his pocket. It was closed. He did not think about his knife at the time of the shooting.

Allene, the sister of deceased, who was in the automobile at the time deceased was killed, gave this account of it: She was at the party at Joe Lunceford's on the night of the homicide. Had the first prom with the defendant. He said let's sit in a car. We got in a Ford. Smelled whisky on his breath that night. Were out there about twenty minutes before the deceased approached the car. We saw him coming. The defendant said, "Yonder he comes." Didn't see the deceased do anything. Noticed he was smoking a cigarette. He looked in a car before he got to where we were, and then approached our car. When the deceased got to the car he passed by enough to catch my eye; then he stepped back, put his foot on the fender, his left hand on the car and right hand on the back of the front seat. He said, "Allene, don't you expect you better get out and come on and play with the rest of us; it don't look nice for you to be sitting out here when the rest are playing games." She didn't say anything. The defendant said, "We are not ready to get out yet." The deceased said, "I don't care what you do, but she is going in the house." About that time she raised up to go, and the defendant started firing, and she fell back. The deceased did not cut the defendant. The deceased did not curse at Bob. She did not see the deceased lay his hand on him at all. Did not see the deceased have a knife in his hand. When she was in a car, about to leave, Nash Glaze came up. She thought he had been with the deceased. She asked Nash, "How is Barney?" Nash said, "He will be all right in a little while." Nash said, "Allene, tell me how it happened." She replied, "He [meaning the deceased] was trying to cut him [meaning the defendant]." She knows the deceased was not trying to cut the defendant. She loved the defendant and was trying to protect him. It was not true that the deceased was trying to cut the defendant.

She did not see any knife. The deceased did not put either one of his hands on the defendant.

Other evidence introduced by the State tended to establish these facts: There were three wounds on the body of the deceased, and three in his left hand. There was a bullet in his chest to the left of the chest bone; about an inch and a half to the left of the chest bone there was another wound. There was a third wound in the left side, a little towards the back. There was a wound through the left middle finger of the defendant. There was a second wound at another point on his left hand, and one through the end of the thumb of the same hand. These wounds were made with bullets. The defendant was engaged to be married to Lois, an older sister of the deceased, on August 5, 1925. A number of love letters from the defendant to this sister ranged in date from June 7, 1925, to the night of the homicide. Allene, a younger sister of the deceased, was about eighteen. She had been going with the defendant about four years. They had set times to be married, and were to be married in October, 1925. On the night of December 18, 1924, Allene went to ride with the defendant in an automobile, leaving home about ten o'clock. They returned about twelve o'clock. On December 18, 1924, a license was issued to the defendant to carry a pistol, for a term of three years. This was the pistol with which the homicide was committed. Horace Lunceford, a brother of the deceased, and a deputy sheriff, arrested the defendant. The sheriff testified that Horace Lunceford gave him the pistol of the defendant at the hospital on the night of the homicide, and that there were five empty shells in it at that time. Oliver Sales was thirty feet from the car when the shooting took place. He saw the deceased just as quick as he could turn around after the shooting stopped. The deceased came towards him with his arms folded across his breast, saying he was shot. After the first shot was fired until he saw the deceased was not over fifteen seconds. He did not see a knife in his hand.

The evidence for the defendant was substantially as follows: On December 18, 1924, the deceased and his brothers Mart and Willie, his uncle Will Smith, and another person went to the home of the defendant at night. His mother had retired and was asleep. The defendant came in and called her. She got up and dressed. She heard some cars coming. One came in the yard and stopped in

front of the door. Some one in the yard said, "Bob, you come out of that house." The mother opened the door and walked out on the porch, when Mart walked up on the steps and said, "I will have you know that Allene is my mother's child as well as Bob is yours." He wanted to know what the defendant's intention was towards Allene. He told them that he intended to marry her. Mart said, "Bob, you know it is wrong to take Allene away from home." The defendant said, "Well I haven't harmed Allene no way, and I think as much of her as I do of my mother." Mart said he didn't object to Bob's attention towards Allene. Mart said something about marrying that night. He tried to get the mother and the boy to get in the car and go and see about it that night. She told him she was not well, that the defendant had done nothing wrong, and she would not force him to go that night. The deceased said he would accept Bob as a brother and treat him as a brother, and he wanted the defendant and Allene to be satisfied if they felt that way towards each other. He asked the defendant and his mother to go and talk it over or see about it that night with his people. The defendant said he would go the next day, and he told him to come. Mart said, "Mrs. Boatwright, we will drop this thing right where it is," when the deceased sanctioned it. On said night of December 18, 1924, the Luncefords were looking for the defendant and Allene. That was about ten o'clock at night. One Short told the defendant that the Luncefords were out looking for him.

In June or July, 1925, the defendant and Lois went to church. The deceased was there. He said to the defendant, "I will get you yet," and he took his sister by the arm and led her off. On Saturday night before the homicide, Allene Lunceford was at the home of one Callaway, as the guest of his daughter. The defendant was there. Her father knocked at the door. Callaway went to the door and found the father of Allene there. He told him that he wanted Allene. Callaway said that she was in the room. Her father went into the room where Allene and the defendant were sitting on a sofa. Her father said to Allene, "You get up and come on home." After he got Allene up, he told the defendant, "Get up and go home." The defendant said, "I am not going home. I am in Mr. Callaway's house." The father replied,

"I will see you later." The defendant then replied, "I will see you too."

E. W. Armour testified that three shots were all that he heard fired. Webb Sisson testified that he heard three shots fired. When the deceased approached the automobile where the homicide occurred, and when within a few steps thereof, he was seen walking with his hat drawn down over his face and his open knife in his right hand. The doctor who attended the deceased on the night of the homicide, stated that a pocket-knife was taken from the coat pocket of the deceased. The coat worn by the defendant on the night of the homicide was introduced. There were knife cuts on it. The defendant proved statements of Allene Lunceford, made right after the homicide, and in reply to questions asked her, that the deceased was trying to cut the defendant when the latter shot the former.

The defendant made substantially this statement in his own behalf: Two or three years ago he went to going with Miss Allene Lunceford, and from that time on they were in love and gradually got deeper, and after a while they were engaged. Along last fall he went up to the schoolhouse one afternoon, and she invited him to go to ride or go to a picture-show with her. He asked her about going to the picture-show, and she told him it didn't make any difference whether they went to ride or to the picture-show, and so they decided to go to ride. They went to ride, and that night about 9:30, Mr. Short met them and told them that the Luncefords were looking for them. He immediately took Miss Allene home, drove to his home, and put up his car. As he went in the house two cars drove up in the yard, and people mounted up on the porch, among whom were Mart Lunceford and Will Smith. "They wanted to come in, and my mother told them they couldn't come in until she was dressed. They called for me to come out." He dressed and went out. Mart Lunceford asked him what his intentions were, and he told him that his intentions were good and that he intended to marry Miss Allene. About that time the deceased came up and asked him what his intentions were, and he told him the same thing. So they gave him a good name and told him they would welcome him as a brother-in-law, and invited him down to talk it over with their mother. He went down the next day, and Miss Allene came out and he told her he wanted to

talk to her mother. Her mother came out, and he asked her about marrying Miss Allene, and she told him she didn't want him to marry Allene. He was surprised when she told him that. That day he was in Washington and met the deceased on the square, and as he met him he looked very angry and told him, "If I wasn't in town I would blow your damned head off, you damned son of a bitch." He told some of his friends about it, and they advised him to take out a license to carry a gun, so he took out the license, not to murder any one, but to protect his life. Later on, when he was at the schoolhouse, talking to Miss Lois Lunceford, out on the porch, the deceased came up and tried to get her to go home with him. She told him, "I am going home with Bob," the defendant. He tried to force her to go home with him, and she wouldn't go. So he dared him to come down in the road to his house any more. So he didn't go, but carried her up to Mart Lunceford's, her brother. Again, he went to a B. Y. P. U. meeting, and was out there in the yard talking to Miss Helen Callaway. Miss Lois came up. The deceased ran between them, and said, "You damned son of a bitch, I am going to kill you." After that he was down to Mr. Callaway's and went to church. He carried Miss Ewell. They went over to the church and came back. They were sitting there and some one came to the door and knocked very rapidly. It was the father of the deceased. He came in and ordered him out twice. Lunceford told him that he wanted to see him down the road. He told Lunceford that he wouldn't go, that Mr. Callaway hadn't told him to leave, and he wouldn't leave. Lunceford said to him, "I will get you yet." He told Lunceford that he would not argue there in Mr. Callaway's house, that he had too much respect for Mr. Callaway and the people in the house. On the fifth Saturday in August he ginned a bale of cotton. The deceased was there. The deceased and he had a long talk. He went home, dressed, and drove back to Short's store. The deceased came in. In a few minutes he went over to Boatwright's store. The deceased followed him. He returned to Short's store, and the deceased followed him there. He then got in his car and drove to Centerville, about a mile above Rayle. He stayed there twenty-five minutes, and drove back to Rayle and stopped at Boatwright's store. Immediately the deceased came in. After that he went over to the party. He played some games,

and after that they passed out some prom cards. He drew card 21, and Miss Allene had prom card 21. He thought a whole lot of Miss Allene Lunceford and always wanted to be with her. So they started out to prom together, and he asked her whether she wanted to sit down. She said let's sit down in that Ford. They were playing around the edges. About four minutes after they sat out there the deceased came hurriedly. He stepped on the running-board and grabbed the defendant in the collar, with his knife in his right hand, and told him he was going to cut his throat, "you God damned son of a bitch." He caught the deceased with his left hand and reached back. He asked him not to, and Miss Allene says, "Please don't, Bonnie." He knew it was his life or the deceased's life, so he reached back in his hip-pocket and got his gun and shot him once. He would not release him, so he shot the deceased again, and pushed him. As he pushed the deceased the latter grabbed his pistol with his left hand. That jerked it up and it shot. And as to shooting him in the back, that was impossible. The deceased then walked up towards his brother's. He was sorry he had to do what he did do, but he realized that he had to do what he did do to save his life.

The State introduced a diagram of the scene of the killing, and evidence to the effect that the deceased, while walking towards the car, had a cigarette in his right hand, and his left hand was hanging down by his side. His sister Lois testified that he did not have a knife when he left her to go to the automobile. There was evidence that the defendant was not drinking on the night of the homicide. The defendant introduced fifteen love letters from Allene Lunceford to him, ranging in date from May 18, 1924, to August 12, 1925.

*B. F. Walker, Lawson E. Thompson,* and *Clement E. Sutton,* for plaintiff in error.

*George M. Napier, attorney-general, M. L. Felts, solicitor-general, T. R. Gress, assistant attorney-general,* and *Earle Norman,* contra.