24870. SMITH *v.* THE STATE.

DECIDED AUGUST 2, 1935.

*Hugh E. Combs,* for plaintiff in error.

*J. Cecil Davis, solicitor-general,* contra.

GUERRY, J. Jim Smith was indicted for the murder of Tucker Smith, his father. The scene of the homicide was the home of Tucker Smith. Those present were Toombs Walton, George Stevens, Maggie Smith, and Hattie Lou Walton. Shortly before the homicide the defendant went into the room where Maggie Smith was seated and began winding the victrola. It is disputed as to whom or what the remark was addressed, but it seems undisputed that the defendant remarked "damn it," and possibly repeated it after being told not to do so, and that Tucker Smith, the deceased, thought the remark was addressed to Maggie Smith, his wife, and mother of the defendant, and ordered defendant out of the house. From this point the witnesses seem to be in conflict as

to the exact sequence of events until the time of the homicide. Toombs Walton testified that immediately after deceased ordered defendant out of the house, he, deceased, got his gun, and that witness took the gun away; that Tucker and defendant became involved in a "scuffle;" that defendant broke loose and went out in the yard and deceased followed to the porch with his (defendant's) clothes and threw them out; that for some minutes defendant and deceased had words, although it was not clear to him what was being said; that defendant "throwed at his daddy twice," at a distance of about 8 feet, with rocks, the first rock missed deceased and the second rock took effect in deceased's breast causing him to fall down the steps, where he died. George Stevens, who evidently was standing out in front of the house in the yard, testified, that when Tucker ordered Jim out of the house, defendant walked out of the house into the yard; and that deceased came out on the porch and brought defendant's clothes and threw them in the yard to defendant. "He told him there was his clothes, take them and leave, and when he needed him he would send for him. Jim said something to him and then he said something back to him, and that time Jim threw two rocks." "Tucker and Jim did not get in a scuffle at the end of the doorsteps." Maggie Smith testified that when Tucker ordered Jim out of the house, Jim went out in the yard; that Tucker got his gun; that Toombs Walton took the gun and deceased then got his razor; that Jim came back in the house to get his shoes and Tucker caught him in the collar and cut him in the head and arm; that defendant pulled loose and deceased cursed him, and "Jim run and got a rock and throwed it;" that Jim did not try to do anything to Tucker except get aloose; that deceased followed Jim and "was going right on towards him" when Jim threw the rock; that she found the razor the next morning right where Tucker fell off the porch. Hattie Lou Walton, testified that she did not see Tucker get a gun, but did see Tucker cutting defendant with a razor, at which time she departed the scene. Defendant's statement was simply that after he broke loose from Tucker he started out and deceased followed him, and defendant picked up a rock and threw at him. "I did not intend to kill him. I was trying to get him loose and make him let me alone, because I knew he was mad and what he would do."

The jury returned a verdict of voluntary manslaughter. From a

reading of the brief of counsel for plaintiff in error and an inspection of the motion for a new trial, these questions seem to be presented for adjudication: (1) When should § 73 of the Penal Code of 1910 be given in charge to the jury? (2) Was there any evidence in the case on which to base the charge of § 73? (3) Did the judge, in the manner of giving his charge on justifiable homicide as contained in §§ 70, 71, and 73, if he was authorized to give the charge, and by their juxtaposition, tend to confuse the jury as to the defendant's rights under the facts of the case, and place upon him an unauthorized burden in his defense?

The judge gave in charge to the jury § 73 of the Penal Code (1910) (Code of 1933, § 26-1014) as follows: "If a person shall kill another in his defense, it must appear that the danger was so urgent and pressing at the time of the killing, that, in order to save his own life, the killing of the other was absolutely necessary; and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given." In discussing the meaning of this section and §§ 70 and 71 of the Penal Code, Mr. Justice Little, in *Powell* v. *State,* 101 *Ga.* 9 (29 S. E. 306, 65 Am. St. R. 277), said: "The two sections of the Penal Code, 70, 73, are parts of the common law. Sir William Blackstone, in the fourth book of his Commentaries, top pp. 134-137, in treating of justifiable homicide, uses this language: 'In some cases homicide is justifiable, rather by the permission than by the absolute command of the law, either for the advancement of public justice, or in such instances where it is committed for the prevention of some atrocious crime.' This is true 'by the law of nature, and also by the law of England, as it stood so early as the time of Bracton, and as it is since declared in statute 24 Hen. 8, ch. 5(5).' Further on, the same author, top pp. 138-9, treating of excusable homicide, declares that 'Homicide in self defense, or se defendendo, upon a sudden affray, is also excusable, rather than justifiable, by the English law;' and is that 'whereby a man may protect himself from an assault or the like in the course of a sudden broil or quarrel, by killing him who asaults him. And this is what the law expresses by the word chance-medley. . . It is frequently difficult to distinguish this species of homicide . . from that of manslaughter. . . But the true criterion between them seems to

be this: when both parties are actually combating at the time when the mortal stroke is given, the slayer is then guilty of manslaughter; but if the slayer has not begun the fight, or (having begun) endeavors to decline any further struggle, and afterwards, being closely pressed by his antagonist, kills him to avoid his own destruction, this is homicide excusable by self defense.' Sir Matthew Hale, in his Pleas of the Crown, chapter 40, makes and preserves the same distinctions. Later common-law writers, Russell, Chitty, Wharton, Bishop, and all others, so far as we have investigated, draw the same distinctions, from which it is evident that the compilers of our Penal Code, in the separation of these. two classes of homicide, meant to continue the distinctions which existed at common law and which were there denominated, respectively, se et sua defendendo and se defendendo as applicable to two different classes of homicide." Thus it was said in *Pugh* v. *State,* 114 *Ga.* 16 (39 S. E. 875): "The law embraced in § 73 of the Penal Code does not qualify or limit the law of justifiable homicide as laid down in §§ 70 and 71 of that Code. The section first mentioned applies exclusively to cases of self defense from danger to life arising during the progress of a fight wherein both parties had been at fault." The answer to the first question stated would therefore seem to be: "The law embodied in the above quoted section of the Penal Code should be given in charge only when, from the facts and circumstances of the case, the jury would be warranted in finding that the homicide was committed in mutual combat, begun and carried on in hot blood, thus rendering both parties blamable." *Dorsey* v. *State,* 110 *Ga.* 331 (35 S. E. 651). See also *Wheeler* v. *State,* 112 *Ga.* 43 (37 S. E. 126); *Moultrie* v. *State,* 112 *Ga.* 121 (37 S. E. 122); *Little* v. *State,* 150 *Ga.* 728 (105 S. E. 359); *Brown* v. *State,* 151 *Ga.* 497 (107 S. E. 536); *Lamp* v. *State,* 164 *Ga.* 57 (137 S. E. 765). "The provisions of law relating to justifiable homicide where the parties had been engaged in mutual combat, contained in § 73 of the Penal Code, are not applicable to a case where there has been no mutual combat and where the defense relied upon is that contained in §§ 70, 71 of the Penal Code." *Stubbs* v. *State,* 110 *Ga.* 916 (36 S. E. 200). See also *Mell* v. *State,* 112 *Ga.* 78 (37 S. E. 121); *Holland* v. *State,* 3 *Ga. App.* 465 (60 S. E. 205); *McCray* v. *State,* 134 *Ga.* 417 (68 S. E. 62); *Morgan* v. *State,* 152 *Ga.* 537 (110 S. E. 286); *Jones* v. *State,* 172 *Ga.* 500

(158 S. E. 44). Where there is no evidence of mutual combat at the time of the homicide, it is error for the trial judge to give § 73 in charge to the jury. *James* v. *State,* 123 *Ga.* 548 (61 S. E. 577); *Delegal* v. *State,* 109 *Ga.* 518-524 (35 S. E. 105); *Freeman* v. *State,* 112 *Ga.* 48 (3) (37 S. E. 172). In order for § 73 to be applicable (in other words, in order for mutual combat to exist), there must be a mutual *intent* to fight, on the part of both parties. *Sanders* v. *State,* 26 *Ga. App.* 475 (106 S. E. 314). It is not necessary that mutual blows be exchanged (*Pollard* v. *State,* 124 *Ga.* 100, 52 S. E. 149; *Buchanan* v. *State,* 153 *Ga.* 866, 113 S. E. 87), nor is it material who strikes the first blow or fires the first shot, nor is it necessary that both parties strike blows or fire shots. *Johnson* v. *State,* 173 *Ga.* 734 (161 S. E. 590). This intent, "like any other intent, may be manifested by acts and conduct of the parties and the circumstances surrounding them at the time of the combat, as well as the circumstances leading up to and culminating in such combat. The question of intent is peculiarly for the jury where there is any evidence from which it may be inferred." *Sanders* v. *State,* supra.

Counsel for defendant contends that defendant was either guilty of murder or was justified under §§ 70, 71, and that § 73 has no applicability to the case. We do not even so construe the defendant's own statement. He stated: "I snatched loose from him and started out the door and he started behind me with a razor in his hand, and I reached down on the ground and got a rock and hit him. I did not intend to kill him. I was trying to get him loose and make him let me alone, because I knew he was mad and what he would do." Defendant did not state that he feared deceased was about to commit a felony upon him and that it was necessary to take his life to prevent it, for he expressly stated that he did not intend to kill him. Taking the evidence of the defendant, the deceased unquestionably showed his willingness to fight by first getting his gun, and, when that was taken away from him, getting his razor, and then cutting defendant. The jury might have well found, from the evidence, that the deceased, in following the defendant out of the house, sought an encounter, or at least a continuation of the one he had already begun, and that defendant, accepting the challenge thus issued, turned and threw one rock, which missed, and then hurled another, which caused the death. At

any rate, there was some evidence from which the jury might well have drawn the conclusion that the accused and the deceased both drew weapons, the latter a rock, and the former a razor, each being willing and intending to fight, and that the deceased was killed in such rencounter. In these circumstances the court did not err in giving in charge to the jury the principle embraced in § 73 of the Penal Code. See *Boatwright* v. *State,* 162 *Ga.* 378 (134 S. E. 91); *Bailey* v. *State,* 148 *Ga.* 401 (96 S. E. 862); *Buchanan* v. *State,* supra; *Daniels* v. *State,* 157 *Ga.* 780 (122 S. E. 223). As was said in *Powell* v. *State,* supra: "It is entirely proper that these two sections of the code and these two theories of justifiable homicide should have been given in charge to the jury by the presiding judge in this case. It would not have been proper for him to have assumed, under the contentions raised, that this homicide occurred under circumstances which would make it justifiable under either one of the theories contended for; that was a question exclusively for the jury; and having been charged with the law applicable to justifiable homicide under the two theories, the jury could and would have applied the same according to the evidence as they believed it to be."

It is true that while the law as embodied in §§ 70, 71 of the Penal Code, and the law requiring that to justify the killing the danger must be urgent and pressing at the time, as embodied in § 73, may be appropriately give in the same case, they should not be given so as to confuse one with the other (*Pugh* v. *State,* 114 *Ga.* 16, 39 S. E. 875; *White* v. *State,* 24 *Ga. App.* 122, 100 S. E. 9; *Little* v. *State,* 164 *Ga.* 509, 139 S. E. 37; *Brown* v. *State,* 168 *Ga.* 282, 147 S. E. 519; *Dover* v. *State,* 109 *Ga.* 485, 34 S. E. 1030; *Pryer* v. *State,* 128 *Ga.* 28, 57 S. E. 93; *Warrick* v. *State,* 125 *Ga.* 133, 53 S. E. 1027; *Smith* v. *State,* 119 *Ga.* 564, 46 S. E. 846; *Lightsy* v. *State,* 2 *Ga. App.* 442, 58 S. E. 686; *Lee* v. *State,* 2 *Ga. App.* 481, 58 S. E. 676; *Warnack* v. *State,* 3 *Ga. App.* 590, 60 S. E. 288; *Ragland* v. *State,* 111 *Ga.* 211, 36 S. E. 682; *Mills* v. *State,* 133 *Ga.* 155, 65 S. E. 368; *Hall* v. *State,* 133 *Ga.* 177, 65 S. E. 400; *Ricketson* v. *State,* 134 *Ga.* 306, 67 S. E. 881; *Rucker* v. *State,* 135 *Ga.* 391, 69 S. E. 541; *Franklin* v. *State,* 146 *Ga.* 40, 90 S. E. 480; *Waters* v. *State,* 146 *Ga.* 102, 90 S. E. 712; *White* v. *State,* 147 *Ga.* 377, 94 S. E. 222; *Surles* v. *State,* 148 *Ga.* 537, 97 S. E. 538; *McAllister* v. *State,* 7 *Ga. App.* 541, 67 S. E. 221;

*Ellis* v. *State,* 21 *Ga. App.* 499), and the court should give appropriate instructions as to the cases in which the provisions of § 73 are applicable.    *Franklin* v. *State,* supra; *White* v. *State,* supra; *Nunn* v. *State,* 14 *Ga. App.* 695 (82 S. E. 56); *Ellis* v. *State,* 21 *Ga. App.* 499 (94 S. E. 629).    However, it is only necessary that we quote the charge of the trial judge in this case to show that the various phases of the law were lucidly and clearly given and could not have confused the jury.    The judge charged:  "Justifiable homicide is the killing of a human being by commandment of the law in execution of public justice; by permission of the law in advancement of public justice; in self defense, or in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either. [Following this the judge gave in charge to the jury the law of voluntary manslaughter and § 71 of the Penal Code.]    Now, gentlemen, the two principles of law which I have charged you, that is, justifiable homicide and also the question of the killing being under the fears of a reasonable man, apply where the defendant himself is without fault—where he is assaulted or attacked without fault on his part, and he simply acts in his own defense; and as to whether they apply in this case is for you to determine under all the evidence and the defendant's statement.    In this connection I charge you that if you believe that this defendant did kill the person named in the indictment, but if you should further believe that at the time he killed him  the deceased was committing a felonious assault upon the person of this defendant with a knife or razor, or if you should believe that the deceased intended or endeavored, by violence or surprise, to commit a felonious assault upon the person of this defendant, or if you should believe that the circumstances surrounding the killing were such as to excite the fears of a reasonable man that the deceased intended or endeavored or was about to commit a felonious assault upon the defendant, and that, acting under the influence of those fears and not in a spirit of revenge, this defendant did kill the person named in the indictment, then, in that event, he would be justifiable and you would not be authorized to convict him of any offense.    The standard of the law is the fear of a reasonable man.    It is not necessary that a felonious assault should have actually been committed upon the person of the defendant.    Neither is it necessary that the deceased

should actually have intended to commit a felonious assault upon the person of the defendant. If the circumstances surrounding the killing were such as to excite the fears of a reasonable man that a felonious assault was intended, or was about to be committed upon the person of the defendant, and, acting under the influence of such fears and not in a spirit of revenge, the defendant killed the person named in the indictment, then and in that event the killing would be justifiable, although the jury might believe that the deceased did not intend at all to commit a felonious assault upon the person of the defendant. I now charge you, gentlemen, § 73 of the Penal Code: [Then follows a verbatim quotation from § 73.] This section of the Code, that is, the one I have just read, applies where there was a mutual intent to fight, or a mutual combat, and does not limit or qualify in any way the defense of justifiable homicide in self-defense, or in defense of person against one who manifestly intends or endeavors by violence or surprise to commit a felony on another; nor does it limit or qualify in any way the defense of justifiable homicide where the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge; but this section sets up a separate and distinct defense, applicable only in cases of mutual combat, and as to whether it applies in this case is for you to determine from the evidence and from the defendant's statement. Now, gentlemen, if you find from the evidence that there was between the defendant and the deceased a mutual combat,—that is, a mutual intent or mutual agreement to fight,—then you will consider these rules of law and apply them to the evidence; but if you find from the evidence that there was no mutual combat, you will not consider this law. Mutual combat is where there is a combat or rencounter between two persons as a result of a sudden quarrel, or such circumstances as indicate a purpose and willingness and intent on the part of both to engage mutually in a fight or rencounter—or where such parties fall out with each other and fight, or arm themselves—provide themselves with weapons for the purpose of fighting, and fighting ensues. It is not essential, to constitute mutual combat, that blows be struck, although if blows are struck, this may be considered by the jury in determining the question. There must be a mutual intent to fight or engage in combat. I charge you that if you should determine

from all the evidence and the defendant's statement that there was an intention upon the part of the deceased to enter into a mutual combat with the defendant, and the defendant also determined to enter into a mutual combat with the deceased, both having an intention at the time to fight, and if under those circumstances the defendant killed Tucker Smith, it must appear, before the defendant could be held guiltless under the law, that the danger to him at the time of the killing of Tucker Smith was so urgent and pressing that in order to save his own life the killing of Tucker Smith at the time was absolutely necessary, and it must also appear that Tucker Smith at the time was the assailant, or it must appear that the defendant had really and in good faith endeavored to decline any further struggle before the mortal wound was inflicted." It need only be said that the defendant could not have asked for clearer instructions on the subject. We have quoted the charge at some length, not only for the purposes of this decision, but in view of the number of cases that come to the appellate courts of this State on this question, as a model charge for clarity and distinctness, for the use of judges in similar cases.

The evidence amply supports the verdict, and the trial judge did not err in overruling the motion for a new trial.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*